**UNITED STATES of America**

v.

**Robert John MANBECK, Thomas Manbeck, Kenneth Herring, Gary Gallopo, Mark Huiet Sale, David Martin Summerville, Lorenz Josephus Proden, Kermit Theodore Brogden, John O'Hare, Eddie Brantley, Thomas Earnest Folske, Thomas Sams Hightower, Timothy Alan Laxton, Harrel Lewis, Jr., John Isidore Stevens, Aaron Douglas Staetter, John Michael Iyoob, Robert Charles Michael, James Anthony Hastings, John Benjamin Barton, Jr., John Wesley Flannel, Jessie Lee Mallory, Arthur Duncan, and Gregory Michael Scott.**

Crim. No. 80–278.

United States District Court,
D. South Carolina,
Charleston Division.

April 24, 1981.

As Amended June 17, 1981.

Lionel S. Lofton, Asst. U. S. Atty., Charleston, S. C., and Cameron B. Littlejohn, Jr., Asst. U. S. Atty., Columbia, S. C., for plaintiff.

Mark Kadish, Rhonda A. Brofman, Kadish, Davis & Brofman, P. C., Atlanta, Ga., and Gedney M. Howe, III, Howe & Howe, Charleston, S. C., for defendants Thomas Manbeck and Herring.

Michael L. Pritzker, Marcia L. Smith, Stroup, Goldstein, Jenkins & Pritzker, Chicago, Ill., and Dennis E. O'Neill, Burkett, Guerard, Wooddy, Bargmann, Cisa & O'Neill, Mount Pleasant, S. C., for defendant Gallopo.

Edward Garland, Austin E. Catts, John R. Hesmer, Garland, Nuckolls & Catts, Atlanta, Ga., for defendants Sale and Proden.

Mark C. Tannenbaum, Charleston, S. C., Local Counsel for defendant Sale.

Gedney M. Howe, III, Howe & Howe, Charleston, S. C., Local Counsel for Proden.

R. David Botts, Harper, Wiggins & Botts, Atlanta, Ga., and Gedney M. Howe, III, Howe & Howe, Charleston, S. C., for defendant Summerville.

Gedney M. Howe, III, Howe & Howe, Charleston, S. C., for defendant Brogden.

Arthur G. Howe, Paul Uricchio, Barry Krell, Uricchio, Howe & Krell, P. A., Charleston, S. C., for defendants O'Hare, Brantley, Folske, Hightower, Lewis, Laxton and Stevens.

Edwin Marger, Diane Marger, Atlanta, Ga., and Peden B. McLeod, McLeod, Fraser & Unger, Walterboro, S. C., for defendants Staetter, Iyoob, Hastings and Scott.

Dale T. Cobb, Belk, Howard & Cobb, Charleston, S. C., for defendant Michael.

Donald B. Walker, Atlanta, Ga., and Peden B. McLeod, McLeod, Fraser & Unger, Walterboro, S. C., for defendants Barton, Mallory and Duncan.

Robert G. Fierer, Steven Westby, Atlanta, Ga., and Peden B. McLeod, McLeod, Fraser & Unger, Walterboro, S. C., for defendant Flannel.

### ORDER

HAWKINS, District Judge.

This case involves a four-count indictment against twenty-four defendants alleging various drug related charges arising out of a drug smuggling operation which took place at Bennett's Point, South Carolina, in November 1980.

Pursuant to motions of numerous of the within defendants, the court on January 27, 1981, ordered that the Clerk of the United States District Court for the District of South Carolina make available to the defendants, their attorneys and investigators, all records relating to jury selection. After the completion of an extensive investigation, a motion was filed on January 29, 1981, by some of the defendants, seeking a stay of the proceedings due to the improper selection of the petit jury. This motion was subsequently joined in by all defendants. Thereafter, a motion, later joined in by all defendants, was filed on February 25, 1981, seeking a dismissal of the indictment due to the improper selection of the grand jury. The former motion became moot due to a redrawing of the petit jury and the subsequent waiver by all defendants of their right to trial by jury. It is the latter motion which this opinion deals with. Specifically, Defendants Flannel, Barton, Mallory and Duncan moved the court, pursuant to the Fifth and Sixth Amendments of the United States Constitution, Title 28, United States Code Section 1867(a), Rule 6 of the Federal Rules of Criminal Procedure and The Amended Plan of the United States

District Court of South Carolina for the Random Selection of Grand and Petit Jurors ("Plan"), that the indictment be dismissed, that the petit array be stricken, and that all proceedings be stayed until such time as the grand and petit jurors were selected in conformity with the Jury Selection and Service Act of 1968, as amended, and the Plan.[1] All other defendants joined in the motion.

As to any issues raised by defendants concerning the petit jury, it would appear that in light of the defendants' waiver of a trial by jury, such issues would not require attention by this court. However, where it is deemed advisable to comment on matters concerning the petit jury, this court will do so.

### A. *MINIMUM POOL SIZE VIOLATION*

The defendants first contend that the Clerk of Court substantially failed to comply with the provisions of Sections 1861 and 1863 of Title 28 of the United States Code and the Plan and violated the Fifth and Sixth Amendments of the United States Constitution when he allowed the grand jury that indicted the defendants to be selected from a qualified jury wheel which contained only 299 names of the first drawing and 267 names on the second drawing.

The *Amended Plan of the United States District Court for the District of South Carolina for the Random Selection of Grand and Petit Jurors*[2] provides in part:

The Clerk shall maintain separate qualified jury wheels for each jury area in the District and a District-wide qualified wheel, and shall place in such wheels the names of all persons drawn from the master jury wheel and not disqualified, exempt, or excused pursuant to this Plan. He shall insure that at all times at least 300 names are contained in each such wheel.

---

1. Defendants challenge both the grand and petit jury panels. The bulk of their arguments, however, considers the grand jury selection process.

2. This 1975 version of the Plan presented to the court as Defendants' Exhibit 16 was the plan in effect when the juries at issue were drawn.

The government's witness, Mr. John Williams,[3] testified that the selection process began with a qualified jury wheel consisting of thousands of names. He confirmed that as the selection procedure advanced, the size of the wheel decreased, until the wheel did contain fewer than the required 300 names for the drawing at issue here. Mr. Williams further testified that it was not a "regular practice" to draw from a wheel consisting of less than the required 300 names.

 This court must reject defendants' contention that the indictment should be dismissed because the drawings were made from a qualified jury wheel consisting of slightly less than the required 300 names. A violation of the district's Local Plan constitutes a violation of the Act if the violation of the Local Plan subverts one of the two paramount purposes of the Act." *See* *United States v. Alexander*, No. CR 79–09N (N.D.Ga.1981). A House Report on the Act stated that the two important principles underlying the Act were the "random selection of juror names from voter lists" and "determination of juror disqualifications, excuses, exemptions, and exclusions on the basis of objective criteria only." H.R. 1076, 90th Cong., 2d Sess. (1968), U.S.Code Cong. & Admin.News 1968, pp. 1792, 1793. Neither of these goals are undermined by the incident in question. Even if the violation of the Plan in this instance constituted a violation of the Act, such a violation was not a substantial one. Section 1867(d) of Title 28 of the United States Code provides that an indictment can be dismissed for *substantial* failure to comply with the Act. This court is persuaded that the situation here constitutes only a mere technical violation of the Act and not a substantial failure to comply with its provisions. Moreover, defendants' constitutional claims are without merit.

### B. DENIAL OF GRAND AND PETIT JURY DRAWN FROM FAIR CROSS SECTION OF THE COMMUNITY

The defendants contend that they were denied their right to a grand and petit jury drawn from a fair cross section of the community in violation of the Plan, Section 1863 of Title 28 of the United States Code, and the Fifth and Sixth Amendments to the United States Constitution. The defendants claim that the qualified wheels do not represent a fair cross section of the community because of the low rate of return of the questionnaires, the tainted nature of the original source (voter registration list), and the high rate of women excused. The court finds these arguments to be unpersuasive.

1. *Low Rate of Return of Questionnaires*

Defendants first argue that the Clerk violated the Plan, Section 1863 of Title 28 of the United States Code and the Fifth and Sixth Amendments to the United States Constitution because the Clerk created the qualifying grand jury wheel after receiving only the return of 80% of the juror questionnaires and 62% for the petit jury. The defendants relied primarily on the argument that the Clerk failed to comply with criteria set by the Plan, which apparently requires a return of 95% or more of juror questionnaires prior to sending the Juror Qualifying Cards to the Division of General Services.[4]

---

3. Designate Clerk of Court for the District of South Carolina.

4. The amended plan signed into effect on January 3, 1975 (Defendants' Exhibit 16), stated that the proposal prepared by the Division of General Services for the State of South Carolina, a copy of which was attached, was made a part of the plan. The 1975 version was submitted to the court with no such proposal attached. Mr. Friedman, defendants' expert, testified that Defendants' Exhibit 6 was the proposal which was part of the 1979 Plan. Transcript at 112. That proposal provides that

"[a]fter the Clerk's office determines that a sufficient number (95% or more) of the juror questionnaires have been returned, the Juror Qualifying cards remaining in the original card file are marked 'UNRETURNED' in the Juror Status Section. All Juror Qualifying cards are sent to the Division of General Services." There remained some confusion as to whether this proposal was actually the one referred to in the 1975 version. Mr. Williams' subsequent testimony did not touch on this question. However, for the purposes of this case, the court will assume that Defendants' Exhibit 6 is

In *United States v. Armsbury*, 408 F.Supp. 1130, 1142 (D.Or.1976), it was recognized that "[t]he failure to require return of questionnaires in no way affects the determination of whether a grand jury [or a petit jury] is drawn from a fair cross section." "The names of those who fail to return questionnaires never enter the qualified pool and therefore are of no importance to the defendant[s]." *Id.*

■ Even if the violation of the Plan in this instance constitutes a violation of the Act, it is the holding of this court that the failure of the Clerk to wait for a 95% return rate for the grand jury or petit jury constitutes only harmless error and was not a substantial failure to comply with the Act. Thus, such a violation of the Act would not provide defendants with a remedy.

### 2. Inadequate Source List

Defendants next contend that because voter registration lists were the sole source of names of prospective jurors, and were not supplemented by other lists,[5] the resulting qualified wheels did not represent a fair cross section of the community. Specifically, defendants contend that Sections 1861, 1863(b)(2), 1865(b)(5), 1869(c) of Title 28 of the United States Code; Section 1971, *et seq.* of Title 42 of the United States Code; the Act of June 25, 1868, 15 Stat. 73; the Jury Selection and Service Act of 1968, and the Fifth, Sixth, Thirteenth, Fourteenth and Fifteenth Amendments to the United States Constitution have been violated.

The court's opinion in *United States v. Blair*, 493 F.Supp. 398, 407 (1980), dealt with this very issue and its treatment of the matter deserves quoting here:

The Jury Selection and Service Act of 1968 specifically requires that voter registration lists be used as the primary source for names of prospective jurors. 28 U.S.C. 1863(b)(2). The use of voter registration lists have been consistently upheld against both statutory and constitutional challenge, unless the voter list in question had been compiled in a discriminatory manner. (footnote omitted) *United States v. Dellinger*, 472 F.2d 340, 366 (7th Cir. 1972); *Wilkins v. Maryland*, 402 F.Supp. 76, 78 (D.Md.1975). Congress recognized that the use of voter registration lists in this manner would exclude from jury service those individuals who do not register to vote. However, Congress concluded that such exclusion would not be unfair since no economic or social characteristic would prevent a person from placing his name on the voter registration list. (cites omitted)

In an attempt to show to the court that the registration lists have been compiled in a discriminatory manner, the defendants argue that South Carolina's disenfranchisement statute[6] has a racially discriminatory effect and was racially motivated when drawn and amended. Thus, argue the defendants, the registration lists are tainted because citizens convicted of numerous crimes are denied the right to register to vote.

■ There was no evidence presented to the court to substantiate this claim, and in the final analysis, this court is unwilling to say that this statute has a discriminatory effect so as to make the use of the voter list per se resultant in a distortion of a fair cross section sufficient to render an indictment constitutionally invalid. *See, United*

---

the proposal referred to in the Plan in effect in 1979.

**5.** It is interesting to note the court's comment in *United States v. Blair*, 493 F.Supp. 398, 407 (1980), where it noted that "counsel have been unable to cite any case decided since the 1968 Act in which a federal court has held that the use of voter registration lists was inadequate and that alternative sources should have been employed." *Id.* at 410, n. 16.

**6.** S.C.Code § 7–5–120(b) provides:

Persons convicted of burglary, arson, obtaining goods or money under false pretenses, perjury, forgery, robbery, bribery, adultery, bigamy, wife-beating, housebreaking, receiving stolen goods, breach of trust with fraudulent intent, fornication, sodomy, incest, assault with intent to ravish, larceny, murder, rape or crimes against the election laws shall be disqualified from being registered or voting, unless such disqualification shall have been removed by pardon.

*States v. Dellinger,* 472 F.2d 340, 366 (7th Cir. 1972).

The very recent Fourth Circuit case of *Allen v. Ellisor,* No. 79–1539 (4th Cir., Jan. 6, 1981) dealt with a constitutional attack on this very statute. The Court per Judge Russell, in an exhaustive opinion, ruled that the statute was constitutional under the equal protection clause. Thus, any issues of this nature raised by defendants have been resolved by this decision.

The defendants argue that, regardless of the lawfulness of the South Carolina disenfranchisement statute, the use of registration lists which exclude those convicted of the named crimes violates the limited terms of the felony exclusion provision of Section 1865 of Title 28 of the United States Code. That section provides that if one has "a charge pending against him for the commission of, or has been convicted in a State or Federal court of record of, a crime punishable by imprisonment for more than one year and his civil rights have not been restored," then he is not qualified to serve on grand and petit juries in the district court.

Defendants' Exhibit 7 showed the disenfranchisement which had occurred in this state only for the years 1969, 1970, 1971, 1972 and 1975. This rather limited exhibit indicated that no one had been disenfranchised for the crimes of adultery, bigamy, wife-beating, fornication and sodomy. For the remaining crimes listed in the statute, at least one person had been disenfranchised for each. However, all of these crimes for which persons were disenfranchised were properly excluded from serving on grand and petit juries since all the crimes were punishable by imprisonment for more than one year.[7] Thus, the use of voter lists which exclude potential voters pursuant to the disenfranchisement statute does not violate the terms of the felony exclusion found in Section 1865(b)(5) of Title 28 of the United States Code.

### 3. *Child Care Exemptions*

Defendants also contend that the provision of the 1975 version of the Plan which provided for an excuse upon request by women who had custody of children under twelve years of age is over-inclusive and violates the Sixth Amendment and the Act because the excuse as administered does not allow juries to be composed of a fair cross section of the community. In short, women, it is argued, are substantially underrepresented on the Qualified Jury Wheel because of the child care exemption provision.

According to the figures included in Exhibit 3 submitted by the defendants, women constitute 51.85% of the population of South Carolina (1980 S. C. Population Projections age 18 up). The Qualified Jury Wheel was composed of 48.48% women. (Grand Jury Selection) (Exhibit 4). The absolute disparity is –3.37%, and the comparative disparity is –6.5%.[8] Such figures do not constitute substantial underrepresentation. *See, United States v. Blair,* 493 F.Supp. at 409. Underrepresentation of

7. The following indicates the South Carolina Code sections providing punishment by imprisonment for more than one year for the named crimes:

Burglary (S.C.Code § 16–11–310 (1976));
Arson (S.C.Code § 16–11–110 (1976));
False Pretenses (S.C.Code § 16–13–240 (1976));
Perjury (S.C.Code § 16–9–10, –9–20, –9–40 (1976));
Forgery (S.C.Code § 16–13–10 (1976));
Robbery (S.C.Code § 16–11–330 (1976));
Bribery (S.C.Code § 16–9–210 (1976));
Housebreaking (S.C.Code § 16–11–320 (Cum. Supp.1980));
Receiving Stolen Goods (S.C.Code § 17–25–20 (1976));
Breach of Trust with Fraudulent Intent (S.C. Code § 17–25–20 (1976));
Incest (S.C.Code § 16–15–20 (1976));
Assault with Intent to Ravish (S.C.Code § 16–3–656 (Cum.Supp.1980));
Larceny (S.C.Code § 17–25–20 (1976));
Murder (S.C.Code § 16–3–20 (Cum.Supp. 1980));
Rape (S.C.Code § 16–3–652, –3–653, –3–654 (Cum.Supp.1980)).

8. Absolute disparity equals the percentage of the group on the voter registration list minus the percentage of the group in the entire population. Comparative disparity is the absolute disparity divided by the percentage of the group in the entire population.

women because of the child care exemption in the Plan does not violate either the Constitution or the Jury Selection and Service Act. *Id.*

### C. *SYSTEMATIC EXCLUSIONS OF IDENTIFIABLE GROUPS FROM SELECTION OF GRAND JURY FOREPERSONS AND DEPUTY FOREPERSONS*

■ Defendants next urge that the indictment should be dismissed because qualified blacks and females have been excluded from the positions of foreperson and deputy foreperson on the basis of race and sex, in violation of Rule 6[9] of the Federal Rules of Criminal Procedure and the Fifth and Sixth Amendments to the United States Constitution. Defendants filed with the court a Statement Reporting Jury Composition Study Results. An exhibit, designated Defendants' Exhibit 2, attached to this statement, which was based on grand jury venire lists and related documents, indicated that the United States District Judges Perry, Chapman, Hemphill and Martin selected nine (9) white males as forepersons and six (6) white males and three (3) white females as deputy forepersons since 1974. The government did not dispute the records as to this point.

#### 1. *Sixth Amendment Protection*

The Sixth Amendment to the United States Constitution affords all criminal defendants the protection of a "speedy and public trial, by an impartial jury." The United States Supreme Court has interpreted the requirement of an impartial grand jury to mean a jury composed of members drawn from a fair cross section of the community. *See, Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979); *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). This same standard has also been specifically applied to an evaluation of the selection of grand jury forepersons. *See, United States v. Jenison,* 485 F.Supp. 655 (S.D.Fla.1979).

In considering defendants' reliance on the Sixth Amendment, the court must focus on the "issue of a fair cross section and not on the issue of discrimination." *United States v. Armsbury,* 408 F.Supp. 1130, 1140 (D.Or. 1976).

The court in *Jenison,* 485 F.Supp. at 661, considered the very issue now before this court. Its discussion and conclusion on the matter deserves adoption here:

> The purpose of the fair cross-section requirement is to assure both the 'diffused impartiality' of a jury drawn from a broadly representative pool and 'Community participation in the administration of the criminal law.' *Taylor v. Louisiana,* 419 U.S. [522] at 530–31, 95 S.Ct. [692] at 698 [, 42 L.Ed.2d 690;] quoting, *Thiel v. Southern Pacific Company,* 328 U.S. 217, 227, 66 S.Ct. 984 [, 989,] 90 L.Ed. 1181 (1946) (Frankfurter, J., dissenting). Neither of these purposes is offended when disproportionate representation is shown in the office of foreman [or deputy] on grand juries whose members were drawn from panels reflecting a fair cross-section of the community from which they were drawn. The fair cross-section right extends to defendants the opportunity of a jury whose members reflect the several 'qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable.' *Peters v. Kiff,* 407 U.S. 493, 503–4, 92 S.Ct. 2163, 2169, 33 L.Ed.2d 83 (1972). Absent a showing that the impact of the grand jury foreperson [or deputy] is so substantial as to influence or alter the unique qualities and characters of the jury's individual members, a defendant's right to a fair cross-section is not denied where identifiable groups are underrepresented in the position of grand jury foreperson [or deputy]. No such showing has been made.

---

**9.** A separate discussion of defendants' reliance on Rule 6, Fed.R.Cr.P., would not be warranted in light of the extended treatment given to their reliance on the Fifth and Sixth Amendments. Rule 6 merely provides in relevant part that the "attorney for the ... defendant who has been held to answer in the district court may challenge the array of jurors on the ground that the grand jury was not selected, drawn or summoned in accordance with law ...."

### 2. Fifth Amendment Protection: Federal Equal-Protection

In *Rose v. Mitchell*, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), the United States Supreme Court recognized the viability of the equal protection-discrimination challenge in the grand jury foreperson context. In order to prevail, the defendants must demonstrate purposeful exclusion of cognizable classes from the office of a grand jury foreperson. *Id.; United States v. Jenison*, 485 F.Supp. 655 (S.D.Fla.1979). Specifically, to prove their prima facie case with regard to the foreperson and deputy foreperson, the defendants must show: (1) that the group allegedly discriminated against is a recognizable, distinct class singled out for different treatment under the laws, as written or as applied; (2) that the group has been substantially underrepresented on jury panels over a significant period of time, and (3) that the selection procedure is not racially neutral or is susceptible to being used as a tool of discrimination. *Rose v. Mitchell* at 565, 99 S.Ct. at 3005; *United States v. Jenison* at 662. Only if the defendants establish a prima facie case of discrimination in the selection of the foreperson and deputy foreperson in accord with this approach, does the burden shift to the State to rebut that prima facie case. *Rose v. Mitchell* at 565, 99 S.Ct. at 3005; *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977).

### 3. Prima Facie Case

Defendants claim that evidence adduced supports a prima facie case of discrimination in the appointment of blacks and women to the office of grand jury foreperson and deputy foreperson.

#### a) Distinct and identifiable classes

This court recognizes, as have courts previously dealing with the issue, that blacks and women are members of recognizable and distinct classes often singled out for different treatment under the laws. *See, United States v. Blair*, 493 F.Supp. at 406, *United States v. Jenison*, 485 F.Supp. at 662.

#### b) Susceptibility of procedure as tool of discrimination

As did the court in *Jenison*, this court recognizes that " 'the selection of forepersons [and deputy forepersons] is susceptible of discrimination since the district judge can observe the race, ethnic background and sex of the grand jurors beforehand.' " *Jenison*, 485 F.Supp. at 663.

#### c) Underrepresentation over a significant period of time [10]

As for determining the level of underrepresentation of qualified members of the distinct classes, this court must consider the "disparity between the ratio of [group members] chosen to be [forepersons and deputy foreperson], and the ratio of [group members] to the total population." *Rose v. Mitchell*, 443 U.S. at 571, 99 S.Ct. at 3008.

In determining what constitutes "substantial underrepresentation," it has been recognized that

> [n]either Congress nor the courts have established an *a priori* figure for determining when a distinct group is substantially underrepresented .... Because the factual situation will vary from district to district the determination of what constitutes substantial underrepresentation necessarily must be made on a case by case basis.

*United States v. Blair*, 493 F.Supp. at 408 (citing *United States v. Test*, 550 F.2d 577 at 589 (10th Cir.)). On this point, it has very recently been said by the en banc U. S. Court of Appeals for the Fifth Circuit that

---

**10.** Defendants' presentation focused on the grand juries chosen from 1974–1981. This eight year span would constitute a "significant period" to support a showing of substantial underrepresentation in light of pronouncements on the matter. *See, Jenison*, 485 F.Supp. at 663, n. 3. (five year span covering fifty grand juries). While this court has serious doubts that any conclusions can be drawn from defendants' study which covers only nine grand juries, it will be assumed for the purposes of this case that the "significant period" prong of the prima facie case is established.

[n]o mathematical standards for the demonstration of systematic exclusion of blacks have been announced; instead, we must glean guidance from Supreme Court precedents. In *Swain v. Alabama,* 380 U.S. 202 [85 S.Ct. 824, 13 L.Ed.2d 759] (1965), disparities ranging from 11 to 16 percent were deemed insufficient to make out a prima facie case, and the Court stated that purposeful discrimination based on race alone could not be 'satisfactorily proved by showing that an identifiable group in a community is underrepresented by as much as 10 percent.' "380 U.S. at 208–9 [85 S.Ct. at 829]. Whether or not greater disparities are sufficient depends upon the facts of each case. *See, e. g., Alexander v. Louisiana,* 405 U.S. 625, 630 [92 S.Ct. 1221, 1225, 31 L.Ed.2d 536] (1972), and *Hernandez v. Texas,* 314 [347] U.S. 475 [74 S.Ct. 667, 98 L.Ed. 866] (1954). The greatest significance of these cases lies in their demonstration that there is no magic figure which proves jury discrimination.

*Barksdale v. Blackburn,* 29 Cr.L. 2025 [639 F.2d 1115] (5th Cir. 1981). Defendants presented evidence to the court in order to show the disparity with regard to black and women forepersons and deputy forepersons in the District of South Carolina.

### (i) Blacks

The defense offered figures to show that of the nine grand juries chosen in the District of South Carolina during the period from 1974 to 1981, no blacks were selected to serve either as foreperson or deputy foreperson.[11] Thus, blacks comprised zero percent (0%) of the total number of grand jury forepersons and deputy forepersons chosen over the eight year period. Figures[12] presented by the defendants show that blacks constituted twenty-nine and eight and one-half percent (29.85%) of the population. The absolute disparity is −29.85%,

while the resulting comparative disparity is −100%. The defendants' expert also calculated that the probability of these results being a chance occurrence was 1 in 591. The court finds that the statistical disparities under either measure establish the requisite underrepresentation of blacks in the offices of grand jury foreperson and deputy foreperson in the District of South Carolina.

### (ii) Women

The record[13] indicates that during the period in question, three white females were selected to serve as deputy foreperson. Women thus comprised sixteen and sixty-seven hundredths percent (16.67%) of the total number of forepersons and deputy forepersons chosen. And females constituted fifty-one and twenty-six hundredths percent (51.26%) of the population. The absolute disparity is −34.59% and the comparative disparity is −32.52%. According to defendants' expert, the probability of these results being a chance occurrence was 1 in 292. The court finds that the deviations are substantial enough to establish the requisite underrepresentation of women in the offices of grand jury foreperson and deputy foreperson.

This court concludes that as to blacks and women, the defendants have proven a prima facie case of discrimination in the selection of grand jury forepersons and deputy forepersons in the District of South Carolina.

### 4. *Rebuttal of the Prima Facie Case*

■ Upon the defendants' showing of a prima facie case of discrimination, the burden shifts to the government to prove the absence of discriminatory intent. *See, Duren v. Missouri,* 439 U.S. at 368, 99 S.Ct. at 671; *United States v. Jenison,* 485 F.Supp. at 662. Rebuttal evidence may include testimony from the judges responsible for the selection of the forepersons and deputy forepersons concerning the method of and qualifications for selection. *See, Castaneda*

---

11. Defendants' Exhibit 2.

12. *Supplemental Statement Re Jury Composition Study* filed by defendants on March 11, 1981, pp. 1 & 2.

13. Defendants' Exhibit 2.

*v. Partida*, 430 U.S. at 498, 97 S.Ct. at 1282; *United States v. Jenison*, 485 F.Supp. at 665.

Defendants subpoenaed two United States District Judges, Judge Robert W. Hemphill and Judge Robert F. Chapman, to testify at the hearing. Both judges had participated in the grand jury empanelments at issue here.[14] Their testimony was the sole testimony upon which the government relied to prove the absence of discriminatory intent. The government called none of its own witnesses to testify to this specific issue.

Judge Hemphill testified that he selected the foreperson and deputy foreperson that he did because they were the "best qualified people I could find in that grand jury to serve in that capacity." Transcript at 214. The criteria which Judge Hemphill employed were "age, employment, level of education, the fact that they were in capacities which called for leadership and called for responsibility and called for dependability and called for honesty and called for integrity." Transcript at 214. On the specific issue of the sex and race of the foreperson and deputy foreperson, Judge Hemphill testified:

> I make women foremen of my jury when I can and blacks on purpose .... I want them to have a sense of responsibility, and I want them to join the community in working for the country. And anytime I can inculcate in somebody a sense of responsibility by making him foreman of the jury or her foreman of the jury, I like to do that."

Transcript at 216.

Judge Chapman testified that he gave no attention to sex or race in selecting the forepersons or deputy forepersons, but looked for someone whom he thought could do the job. Transcript at 238. In Judge Chapman's words:

> I look at the person's face. I look at their educational background. I look at the position that they may hold in the community—that is the employment.

And I also primarily use my sense of sight and my judgment of people as I watch them for the half hour that I charge the grand jury.

Transcript at 236.

Upon consideration of the evidence, it is the conclusion of this court that the absence of discriminatory intent on the part of the judges responsible for the selection of grand jury forepersons and deputy forepersons has been proven. The presumption of unconstitutional action has been rebutted.

### D. *RANDOM SELECTION*

#### 1. *Selection of Starting Numbers*

■ The Jury Selection and Service Act provides that jurors shall be randomly selected, 28 U.S.C. §§ 1861 and 1863, and the Plan apparently provides for a system whereby a starting number must be randomly drawn from a drum or box to start the actual random selection. Defendants' Exhibit 6, p. 3, and Exhibit 8. Defendants contend that the Clerk of Court's administration of the Plan has resulted in selection of starting numbers from a chart rather than by drawing, thus allowing the possibility of human discretion or choice in selection of any name and making the names selected predictable, in violation of the Plan and Sections 1861, 1862 and 1863(a) of Title 28 of the United States Code.

The court initially has difficulty in determining exactly what the Plan in effect said about the specific procedure to be used in the selection of a starting number. Apparently, defendants look to Defendants' Exhibit 6 and rely on the provision therein which states that the "Clerk's office will draw a starting number using the procedure described in Appendix C—Juror Name Selection Formula." In addition to the court's previously expressed concerns as to whether Exhibit 6 was in fact a part of the 1975 Amended Plan, there is no exhibit before this court entitled "Appendix C— Juror Name Selection Formula." Defendants' Exhibit 8, entitled *Comments on Se-*

---

14. Judge Hemphill presided over the empanelment of one grand jury and Judge Chapman presided over two. No testimony was present-ed from Judge Perry and Judge Martin who presided over the remaining grand juries.

*lection Method Provisions in Jury Plans*, does deal with the procedure to be used in selecting a starting number, but it is unclear that Exhibit 8 is the Appendix C referred to in Exhibit 6. Nevertheless, the court will proceed to discuss the issues raised by defendants and assume that Defendants' Exhibits 6 and 8 are the ones upon which the defense represents to the court that the 1975 Amended Plan required the starting number to be drawn from a drum or box.

Mary Wilson, Jury Clerk employed by the U. S. District Court Clerk's office, testified that she was in charge of drawing the juries in the state. She testified that she was told by the Clerk the number of names in each wheel and how many jurors were needed. She would then divide the number of jurors needed into the number of names in the box. The quotient derived from this calculation would then be fed into the chart, Defendants' Exhibit 9. The chart would provide the starting number. Ms. Wilson could not recall how long she had utilized this procedure. Transcript at 45–49.

The specific issue presented to the court is whether the use of the chart to determine the starting number substantially violates the Plan and the Act so as to warrant dismissal of the indictment. This court thinks not. The failure of the jury clerk to draw the starting number out of a container constituted harmless error. Simple deviations in the random selection of starting numbers should not constitute a substantial failure to comply with the Act or the Plan and result in harsh consequences of dismissal of indictments. *United States v. Alexander*, No. CR 79–09N (N.D.Ga.1981). "That a standard of perfection in achieving randomness was not contemplated by Congress is clear from the legislative history." *Id.*, at 52.

The court's holding is made in light of the consideration that, contrary to the situation dealt with in the recently decided *Alexander* case, where the jury clerk had received at least two prior warnings, this is apparently the first instance where these proce-dures of the Clerk's office have been questioned. Also, the court reiterates its concern over the apparent lack of clarity as to exactly what the approved Plan required so far as the procedure for the selection of the starting number.

A suggestion to the Clerk of Court would, in this instance, be appropriate. Employing the use of a drum or box in the selection process would insure that no further questions may be raised about the randomness of the process utilized.

### 2. *Practice of Stopping the Computer Program*

The final contention made by the defendants focuses on the Clerk of Court's practice of stopping the computer program when the required number of qualified jurors is reached. Defendants contend that the selection of panels from the Qualified Jury Wheel was not accomplished in a random fashion because when the jury clerk obtained the desired number of names, the excess names at the end of the list were dropped. This process resulted in the exclusion of persons whose last names began with a letter at the end of the alphabet.

The court finds Judge Harvey's approach to this issue in *Blair* to be persuasive and again wishes to quote it at length:

The experts agree that the operation of the jury system in this manner is not statistically random. However, defendants have not established that the practice substantially excluded a distinct group or that a fair cross-section of the community was not obtained when names [not] beginning with ... [all] of the twenty-six letters of the alphabet were used for the selection of juries in this District. On the contrary, the record in this case convinces this Court that this District's Plan does provide a fair cross-section of the community. Although this Court does not endorse the practice which effectively excludes persons whose names begin with the last ... letters of the alphabet and would suggest that some other system be used by the Clerk to eliminate excess names, so long as the practice does not prevent a fair cross-sec-

tion of the community from serving as jurors, it does not violate defendants' rights under the Constitution or under the statute. *See Krause v. Chartier*, 406 F.2d 898, 901 (1st Cir. 1968).

### E. *CONCLUSION*

Based on the foregoing, the court finds and concludes that the defendants' pending motion to dismiss the indictments should be and is denied.

AND IT IS SO ORDERED.