UNITED STATES of America, Appellee,

v.

Albert Eugene CARMICHAEL,
Appellant.

UNITED STATES of America, Appellee,

v.

Joe Grady FLOWERS, Appellant.

Nos. 81–5141(L), 81–5142.

United States Court of Appeals,
Fourth Circuit.

Argued May 6, 1982.

Decided Aug. 12, 1982.

Rehearing Denied Sept. 16, 1982.

Ronald P. Fischetti, New York City, Morris D. Rosen, Charleston, S. C. (Rosen, Oberman & Rosen, Charleston, S. C., on brief), John C. Lindsay, Bennettsville, S. C. (Henry Hammer, Columbia, S. C., on brief), for appellants.

Craig C. Donsanto, Director, Election Crimes Branch, Washington, D. C., Thomas P. Simpson, Asst. U. S. Atty., Columbia, S. C. (Henry Dargan McMaster, U. S. Atty., Columbia, S. C., David J. Slattery, Sp. Asst. U. S. Atty., Nancy Simmons Stewart, Public Integrity Section, Criminal Div., Dept. of Justice, Washington, D. C., on brief), for appellee.

Before PHILLIPS and ERVIN, Circuit Judges, and DOUMAR,* District Judge.

ERVIN, Circuit Judge:

In this appeal, Albert Eugene Carmichael, Jr. and Joe Grady Flowers challenge their convictions stemming from an extensive vote-buying investigation of the 1980 democratic primary election in Dillon County, South Carolina.[1] The defendants were tried together and both were convicted of conspiracy to buy votes and substantive counts of vote buying in the primary election, as well as obstruction of justice in connection with the grand jury investigation of the election. Carmichael challenges the sufficiency of the evidence supporting his convictions, while Flowers joins him in vigorously pressing other grounds for reversing the convictions, including lack of federal jurisdiction to prosecute, prejudicial joinder of the obstruction charges, improper selection of the grand jury, and erroneous admission of certain evidence. Upon consideration of each of these arguments and assiduous scrutiny of the record below, we find no error and, therefore, affirm the convictions.

I.

On February 2, 1981, Albert Eugene Carmichael, a South Carolina state senator at that time,[2] and Joe Grady Flowers, Mr. Carmichael's parttime employee, were indicted for conspiracy, obstruction of justice and buying absentee ballots in connection with the June 10, 1980, democratic primary election in Dillon County, South Carolina. Among the offices contested in the election were the Sheriff of Dillon County, United States Senate and United States House of Representatives. In count one of the indictment[3] Mr. Carmichael and Mr. Flowers were charged with conspiracy to pay voters to vote for incumbent Sheriff Roy Lee in violation of 18 U.S.C. § 371. Counts two through thirteen charged the appellants with knowingly and willfully paying and offering to pay and willfully aiding and abetting others to pay twelve voters in violation of 42 U.S.C. § 1973i(c)[4] and and 18

---

* The Honorable Robert G. Doumar, United States District Judge for the Eastern District of Virginia, sitting by designation.

1. The appeals were consolidated by order of this court pursuant to local rule 19.

2. Mr. Carmichael resigned from the state senate on March 12, 1982, almost ten months after he was adjudged guilty and sentenced by the district court.

3. Mazel J. Arnette originally was indicted with Mr. Carmichael and Mr. Flowers. She entered a plea of guilty the day before trial and testified as a witness for the government.

4. Section 1973i(c) provides as follows:
   Whoever knowingly or willfully gives false information as to his name, address, or period of residence in the voting district for the purpose of establishing his eligibility to register or vote, or conspires with another individual for the purpose of encouraging his false registration to vote or illegal voting, or pays or offers to pay or accepts payment either for registration to vote or for voting shall be fined not more than $10,000 or imprisoned not more than five years, or both: Provided, however, that this provision shall be applicable only to general, special, or primary elections held solely or in part for the purpose of

U.S.C. § 2.[5] Count fourteen charged Mr. Flowers with obstruction of justice for urging a subpoenaed witness to give false testimony before the grand jury. Count sixteen charged Mr. Carmichael with obstruction of justice based on similar allegations.

On March 31, 1981, the defendants filed a motion for dismissal of the indictment because of improper selection of the grand jury. That motion was denied by an order of the court dated May 14, 1981. Various other pretrial motions including a defense motion for separate trials were heard and disposed of on March 4, 1981, and the parties went to trial on April 13, 1981.

Mr. Carmichael has been active in Dillon County politics for twenty-five years. In 1978, he was elected to fill an unexpired term in the state senate to represent a district that included Dillon, Marlboro, Chesterfield, and Lee Counties. He ran for re-election in the 1980 democratic primary and general election and was elected to a four-year term. During the 1980 elections he also served as a state democratic executive committeeman from Dillon County and as a county executive committeeman from Lakeview precinct.

Mr. Flowers was for many years the postmaster in Lakeview and was barred from engaging in any political activity by the Hatch Act. In early 1979 he retired from the post office and began parttime work as a secretary for his close friend, Carmichael. Flowers was paid $50.00 a week as expense money for work in Carmichael's Lakeview office. In mid-April 1980, Sheriff Roy Lee[6] asked Flowers to work for him in his re-election campaign. Lee gave Flowers $500.00 cash to pay "haulers" who were to help people register, obtain absentee applications or get to the polls. Carmichael gave Flowers permission to work for Lee and gave Flowers $500.00 to help in Lee's campaign. Flowers added another $200.00 to $300.00. No records were kept to account for this money.

To vote absentee in a primary election in South Carolina, a voter applies by mail or in person to the County Executive Committee at a location the Committee designates as the absentee voting place or precinct. When the County Executive Committee receives a completed application it checks with the Board of Voter Registration to determine whether the applicant is registered in that county and, if so, mails the applicant an absentee ballot along with instructions, an oath envelope and a return envelope. The applicant is instructed to vote the ballots, put them in the oath envelope, sign the oath which states that he is qualified to vote in the election and has not voted any other ballots, seal the oath envelope, put it in the pre-addressed envelope to the county absentee precinct, and mail it.

On April 14, 1980, the chairman of the Dillon County Democratic Party, Alan Schafer,[7] wrote Carmichael a letter placing him in charge of absentee ballot procedures in Lakeview. Schafer instructed Carmichael to make absentee applications available to voters from his office or other places that would be convenient. The applications were to be forwarded to Schafer, who would mail out ballots to all qualified applicants. That same day, Carmichael wrote Flowers delegating to Flowers his authority

selecting or electing any candidate for the office of President, Vice President, presidential elector, Member of the United States Senate, Member of the United States House of Representatives, Delegate from the District of Columbia, Guam, or the Virgin Islands, or Resident Commissioner of the Commonwealth of Puerto Rico.
42 U.S.C. § 1973i(c) (1981).

5. Section 2 provides as follows:
(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.
18 U.S.C. § 2 (1969).

6. Roy Lee pleaded guilty to charges of conspiracy to buy votes in connection with his re-election in the 1980 democratic primary.

7. Alan Schafer pleaded guilty to conspiracy and substantive counts of mail fraud for the illegal and fraudulent use of absentee ballots to re-elect Roy Lee as Sheriff.

to distribute absentee ballot applications from Carmichael's office.

On April 21, April 28, and May 12, political meetings for Sheriff Roy Lee's re-election campaign were held at Carmichael's lakehouse. Among the fifty-five to seventy-five persons who attended the first supper meeting were Flowers, Carmichael, Lee and a number of Lee's workers and supporters. Government witnesses testified that at each of these meetings the discussion centered on getting blacks to vote by absentee ballot and the fact that the voters wanted money. Sammie Lee Catoe, a trustee at the Dillon County Jail who cooked the supper, testified that after most guests at the first meeting had gone, he heard Carmichael tell Sheriff Lee that if Lee would just take five dollars and add it to what Lee had paid during the last election, he could win. Catoe also testified that Carmichael told Lee that they needed about 1,700 absentee ballots to win.

At the second and third meetings, the discussion centered on procedures for soliciting absentee ballots and how much voters would have to be paid. Government witnesses who attended these meetings testified that as workers for Lee they would be paid $10.00 per absentee ballot turned in and that they could pay the voters whatever they wished, probably $5.00. Applications for absentee ballots were available at the meeting and it was suggested that the workers would tell the voters to use employment outside the county or vacation as the reason for applying for absentee ballots. Flowers attended all three of these meetings; Carmichael was present at only the first and third.

The vote-buying scheme was carried out as planned. Workers for Lee picked up absentee ballot applications from Flowers at Carmichael's office in Lakeview. They took these applications to voters, had them filled out, and turned them back in to Flowers. After the ballots were mailed to the voters, the workers usually returned to help the voter fill out the ballot and then turned the ballot in to Flowers. In some cases, the ballots were sealed when returned as required by the instructions; in many cases they were unsealed. Flowers paid the worker $10.00 per ballot and the worker paid the voter.

Several witnesses testified that during the campaign they communicated with Carmichael. Mazel Arnette testified that several times before the election, Carmichael told her it was all right to pay voters for their time and trouble and to give voters some money as long as she did not tell them she was buying a vote. Luther Nance [8] stated that he was recruited to buy votes and met Flowers at Carmichael's office to receive instructions about absentee ballots. Further, Nance stated that after the investigation began, he met with Carmichael at his office and the senator told him "if anybody came around, asking me (Nance) anything about giving anybody any money, tell them I didn't." Similarly, Mr. Freddie Wilson testified before the grand jury that Flowers had told him on two occasions to lie about giving money to voters. At trial, Wilson said he did not recall that testimony, but when it was read to him, he said he remembered and affirmed his prior testimony. Another witness testified that Carmichael told him that his expenses would be paid and "if you want to give somebody something, that's up to ya'll. I don't see anything wrong with that." Robert Miller, a lifelong Dillon County resident, testified that he was in the gas station in front of Carmichael's office on May 10, 1980, when Carmichael came in and asked Flowers how many absentee ballots had been collected that day. After Flowers said about fifty, Carmichael responded, "(t)hat's good."

The government also introduced tally sheets of county-wide absentee ballot totals, which showed that 1,265, or 94% of all absentee ballots cast in Dillon County, were

8. Nance testified under a plea agreement by which he pleaded guilty to one count of vote buying in exchange for his testimony.

cast for Sheriff Lee.[9] In Lakeview precinct, which is one of twenty-one precincts in the county, 400 persons voted absentee. Two out of every five votes cast in Lakeview precinct were by absentee ballot.

Carmichael and Flowers both testified in their own defense. Each categorically denied paying any voters for their votes, engaging in a conspiracy to buy votes, or telling anyone to give false testimony to the grand jury. Flowers admitted giving money to the campaign workers, but denied instructing them to return the absentee ballots to his office. He also admitted giving several voters a few dollars after they gave him their absentee ballots, but said that the money was a loan. Carmichael admitted that he had won his own race for the state senate in 1979 with 960 out of 970 absentee ballots cast in his district cast for him.

## II.

### A.

Carmichael and Flowers were convicted under 42 U.S.C. § 1973i(c), which provides in pertinent part as follows:

"Whoever knowingly or willfully . . . pays or offers to pay . . . for votes shall be fined no more than $10,000, or imprisoned not more than five (5) years, or both: Provided, however, that this provision shall be applicable only to general, special, or primary elections, held solely or in part for the purposes of selection or electing any candidate for the office of President, Vice-President, President Elector, Member of the United States Senate, Member of the United States House of Representatives . . . ."

The defendants contend that Congress has power to control only federal elections and that 42 U.S.C. § 1973i(c) requires proof that any vote buying actually affected an election for federal office. The government

argues that Congress is empowered by the Constitution and intended to prohibit any vote buying that occurs during a mixed state/federal election because such criminal activity potentially corrupts all contests in the election. This issue was resolved by this court in *United States v. Mason*, No. 81–5025 (4th Cir., March 25, 1982) (unpublished), which is a case arising out of the same vote-buying scheme giving rise to the convictions at issue in this case.

In *Mason*, the defendant was one of Sheriff Lee's campaign workers who paid for absentee ballots. We held that it is not necessary for the government to prove that vote-buying activities actually affected a federal contest. Rather, a violation of § 1973i(c) is established when the evidence shows that a defendant bought or offered to buy a vote and that such activity

exposes the federal aspects of the election to the possibility of corruption, whether or not the actual corruption takes place and whether or not the persons participating in such activity had a specific intent to expose the federal election to such corruption or possibility of corruption.

*Id.*, Slip Op. at 6 (quoting *United States v. Bowman*, 636 F.2d 1003, 1011 (5th Cir. 1981).

There was a possibility of corruption of the two federal contests in the Dillon County democratic primary because many of the envelopes containing the absentee ballots were unsealed when they were picked up from the voters and when they were turned in to Flowers. There was also testimony that Flowers and several workers helped voters mark their absentee ballots not only for the sheriff's race, but for others as well.[10] We hold, therefore, that the statute clearly proscribes the conduct for which Flowers and Carmichael were prosecuted in this case. The power of Congress to proscribe conduct that poten-

---

**9.** Lee received a total of 3,905 votes. Mr. Rogers, Lee's opponent, received a total of 4,686 votes, with only 81 of these votes being absentee.

**10.** Of the 1,346 absentee ballots cast in the sheriff's race, Lee received 1,265. Of the 1,308

absentee ballots cast in the race for United States House of Representatives, incumbent John Jenrette received 1,108. Clearly, some of the 400 absentee ballots received in Lakeview precinct were voted in the congressional election.

tially corrupts a federal contest in addition to conduct that actually corrupts a federal contest has been upheld previously. *See In re Coy*, 127 U.S. 731, 8 S.Ct. 1263, 32 L.Ed. 244 (1888); *United States v. Malmay*, 671 F.2d 869 (5th Cir. 1982); *United States v. Mason, supra.*[11]

### B.

■ Carmichael also challenges his conviction on the ground that the evidence was not sufficient to prove beyond a reasonable doubt that he conspired to buy votes and aided and abetted payments to twelve voters named in the indictment. We must decide, therefore, whether there is substantial evidence, when considered in the light most favorable to the government, that shows Carmichael is guilty beyond a reasonable doubt. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Stroupe*, 538 F.2d 1063 (4th Cir. 1976). The existence of an illegal agreement need not be proved by direct evidence, but may be inferred from facts and circumstances that show that the defendant acted in concert with another to achieve an illegal goal. *United States v. Laughman*, 618 F.2d 1067, 1074 (4th Cir.), *cert. denied*, 447 U.S. 925, 100 S.Ct. 3018, 65 L.Ed.2d 1117 (1980). Further, once the existence of the conspiracy has been proved, the only additional proof necessary is the defendant's knowledge of the conspiracy and direct or indirect evidence of some action indicating his participation. *Id.; United States v. Harris*, 409 F.2d 77, 83 (4th Cir. 1969).

■ The evidence of the supper meetings at Carmichael's lakehouse at which the vote-buying plans were made clearly is sufficient evidence of the existence of a conspiracy. Further, it is clear Carmichael knew of the scheme. His parttime employee managed the vote-buying plan from Carmichael's office with Carmichael's tacit approval. And when he asked Flowers how many ballots had been received on May 10, and was told about fifty, he said "(t)hat's good."

The evidence that Carmichael participated in the conspiracy and aided and abetted in the scheme is less direct. It is clear, however, that he personally recruited two workers and told them it was okay to pay voters. In addition, the jury could infer Carmichael's participation from his authorization of Flowers to coordinate the absentee ballot system from Carmichael's office. Carmichael's sponsorship of the meetings when the scheme was planned also supports the inference of participation. Finally, the fact that Carmichael told Luther Nance not to tell the FBI about any money supports the inference that Carmichael knew of and participated in the conspiracy.

### C.

Carmichael and Flowers both contend that the trial court erred in denying their motion for severance of the obstruction of justice charges pursuant to Fed.R.Crim.P. 8(b) and 14. Rule 8(b) authorizes joinder if the defendants "are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Rule 14 provides that "if it appears that a defend-

11. Carmichael and Flowers argue that the Supreme Court required a showing of actual corruption of a federal election in *Blitz v. United States*, 153 U.S. 308, 14 S.Ct. 924, 38 L.Ed. 725 (1894). In *Blitz*, the Court held that a defendant who voted in the name of another person in a mixed federal/state election could not be prosecuted under federal law because the indictment did not allege that the defendant voted for a federal candidate. In *In re Coy*, 127 U.S. 731, 8 S.Ct. 1263, 32 L.Ed. 274 (1888), however, the Court had held that the defendants who had induced election officers to take election records in a federal/state election to persons with no authority to receive them could be prosecuted under federal law. The *Blitz* court distinguished *Coy* on the ground that delivery of tally sheets to unauthorized persons raised the danger of corrupting the federal and state contests, whereas in *Blitz*, no such danger was present. We think *Coy* controls this case because just as the unauthorized persons in possession of election records posed a threat to the federal contest in *Coy*, the facts that Flowers and the workers helped voters vote and had possession of unsealed ballots posed a threat to the federal contest in this case.

ant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information, the court may order an election or separate trials of counts, (or) grant a severance . . . ."

Carmichael and Flowers assert that because the separate obstruction of justice counts were entirely separate and distinct offenses from the conspiracy counts and from each other, joinder was improper as a matter of law under Rule 8(b), citing *Cupo v. United States*, 359 F.2d 990 (D.C.Cir. 1966), *cert. denied*, 385 U.S. 1013, 87 S.Ct. 723, 17 L.Ed.2d 549 (1967). In *Cupo*, the D. C. Circuit held that joinder of substantive charges of acquiring automobiles by false statements with charges of conspiracy to obtain other merchandise on credit from stores by false statements was impermissible without a showing of prejudice to the defendants under Rule 14 because such offenses were not part of the same act or transaction or series of acts or transactions.

■ The government argues that under Fourth Circuit precedent the obstruction of justice charges and the conspiracy charges were part of the same series of acts or transactions. We agree. Generally, "transaction" is a flexible term implying a connection of logical relationship rather than immediateness. *Cataneo v. United States*, 167 F.2d 820 (4th Cir. 1948). In this case the obstruction of justice charges related to actions by Carmichael and Flowers to conceal the actions for which they were charged under conspiracy and substantive counts. Similar concealment activities have been held to be properly joined under Rule 8 by this circuit in *United States v. Santoni*, 585 F.2d 667 (4th Cir. 1978), *cert. denied*, 440 U.S. 910, 99 S.Ct. 1221, 59 L.Ed.2d 459 (1979), and by other circuits. *See, e.g., United States v. Weiss*, 491 F.2d 460 (2d Cir.), *cert. denied*, 419 U.S. 833, 95 S.Ct. 58, 42 L.Ed.2d 59 (1974); *United States v. Isaacs*, 493 F.2d 1124 (7th Cir. 1974).

Carmichael and Flowers also argue that even if joinder was permissible under Rule 8, the judge in his discretion should have granted severance under Rule 14 because joinder resulted in prejudice to them. They

reason that they were prejudiced because the jury might have improperly cumulated all the evidence to infer a criminal disposition or to find guilt on all offenses when they may have been acquitted in separate trials solely on evidence of the separate offenses. *See United States v. Jamar*, 561 F.2d 1103, 1106 (4th Cir. 1977).

■ As the government points out, however, evidence of the conspiracy and actual vote buying would have been admissible against each defendant in separate trials for obstruction of justice to prove motive. Likewise, evidence supporting the obstruction of justice count against each defendant would be admissible against each defendant in a separate trial on conspiracy and the substantive counts to show criminal intent. *See United States v. Seidel*, 620 F.2d 1006, 1012 (4th Cir. 1980). Carmichael and Flowers vigorously contend, however, that if they had been tried separately on the obstruction of justice counts, evidence supporting the obstruction charge against Carmichael would not have been admissible against Flowers and vice versa. Nevertheless, prejudice does not result automatically from a situation where some evidence not admissible in separate trials is admitted in a joint trial. We agree with the Sixth Circuit that

> absent any unusual circumstances the matter of severance rests in the sound discretion of the trial judge, particularly where there is a charge of conspiracy as well as other counts of an indictment alleging substantive violations.

*United States v. Branan*, 457 F.2d 1062, 1066 (6th Cir. 1972).

Although every bit of evidence that was admissible in the defendants' joint trial might not be admissible against each of them in separate trials of the obstruction charges, we perceive no particular danger that the jury would cumulate such evidence against either Flowers or Carmichael. We, therefore, find no abuse of discretion on the part of the trial court on this issue.

### D.

■ Carmichael and Flowers also contest the admissibility of tally sheets reflecting the total number of absentee votes cast in Dillon County on grounds that it was irrelevant or, if relevant, its prejudicial effect outweighed its probative value under Fed.R.Evid. 403.[12] Appellants reason that the tally sheet is irrelevant because it showed the total number of absentee votes cast throughout the county, while the vote-buying charges referred to illegal activities in Lakeview precinct only. The tally sheets showed that 1,265 absentee votes were cast for Sheriff Lee county-wide, while only 81 were cast for his opponent. The Lakeview precinct book showed that almost 400 persons, or two out of every five voters in that precinct, received absentee ballots. The numbers on the tally sheet put the number of absentee ballots issued in Lakeview precinct in perspective. The tally sheet, while not relevant to the substantive counts, was relevant, therefore, to show the success of the conspiracy in Lakeview precinct. Under these circumstances it was not an abuse of discretion for the trial court to find that the danger of unfair prejudice did not substantially outweigh the probative value of the evidence.

### E.

Finally, Carmichael and Flowers argue that their indictments should be dismissed and their convictions reversed because of improper selection of the grand jury under the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 *et seq.*, and the Plan of the United States District Court for the District of South Carolina for the Random Selection of Grand and Petit Jurors.[13]

■ Appellants first argue that because the pool from which the grand jury issuing their indictments was drawn contained slightly less than 300 names as required by South Carolina's Random Selection Plan, the Jury Selection and Service Act was violated and the indictments must be dismissed.[14] Although the Act requires courts to follow their jury selection plans, it contains no minimum pool size requirement. The district court below recognized that there had been a technical violation of the Plan. The Act, however, requires a substantial violation of its provisions before an indictment may be dismissed. 28 U.S.C. § 1867(d) (Cum.Supp.1982); *United States v. Bearden,* 659 F.2d 590 (5th Cir. 1981). The two objectives furthered by the Act are "random selection of juror names from voter lists" and "determination of juror disqualifications, excuses, exemptions, and exclusions on the basis of objective criteria only." H.R.Rep.No.1076, 90th Cong., 2d Sess., *reprinted in* (1968) U.S.Code Cong. & Ad.News 1792, 1793. We agree with the district court that the technical violation of the Plan does not affect the objectives of the Act and, therefore, does not amount to a substantial violation of the Act. *See United States v. Manbeck, et al.,* 514 F.Supp. 141, 144 (D.S.C.1981).

Appellants' second contention is that four factors present in the selection of the grand jury resulted in an unrepresentative cross section of the community being present in the jury pool. The factors alleged are: 1) the sole use of voter registration lists as the starting point for the jury pool; 2) the racially discriminatory effect of South Carolina's disenfranchisement statute; 3) the high rate of women excused from jury duty; and 4) the low return rate of juror questionnaires. The record contains little

---

**12.** Fed.R.Evid. 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the ideas, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

**13.** In their motion in the district court, the appellants incorporated the evidence and exhibits supporting a similar motion that was denied by Judge Falcon B. Hawkins in *United States v. Manbeck, et al.,* 514 F.Supp. 141 (D.S.C.1981).

**14.** The jury wheel contained 299 names for first drawing and 267 names for second drawing from which the grand jury was selected.

evidence to support these allegations. As recognized in *United States v. Blair*, 493 F.Supp. 398, 407 (D.C.Md.1980), 28 U.S.C. § 1863(b)(2) specifically requires that voter registration lists be used as the primary source for names of prospective jurors. Appellants apparently argue that the South Carolina Disenfranchisement Statute, *S.C. Code Ann.* § 7–5–120 (1976), has a racially discriminatory effect on the South Carolina voter registration lists and, therefore, taints any grand jury drawn from a pool using the lists. This court, however, has recently upheld the constitutionality of that statute in the face of an attack on equal protection grounds. *See Allen v. Ellisor*, 664 F.2d 391 (4th Cir.), *vacated and remanded*, 454 U.S. 807, 102 S.Ct. 80, 70 L.Ed.2d 76 (1981), *dismissed as moot and remanded on other grounds*, No. 79–1539 (February 16, 1982) (unpublished).[15]

■ Appellants' third contention concerning the rate of excuses for women is equally without merit. Under the South Carolina Plan, women with children under twelve years of age are excused from service on the grand jury upon request. According to the appellants' figures, the jury pool from which the grand jury in this case was drawn was composed of 48% women while the community contained 52% women. The contention that the 4% difference constitutes substantial underrepresentation of that group of women is simply frivolous.

■ Finally, appellants argue that the Plan requires a 95% return rate of grand jury questionnaires and because the return rate for this grand jury was less—approximately 70% average—the fair cross section requirement of the Act was not met. A low return rate of questionnaires without some evidence that such rate caused underrepresentation of some group, does not amount to a substantial violation of the Act. Without other evidence, unfair cross section simply cannot be inferred. *See United States v. Armsbury*, 408 F.Supp. 1130, 1142 (D.C.Or.1976).

**15.** *Allen* was dismissed on the merits for mootness because section 7–5–120(b) was amended in 1981 to disenfranchise only those persons

III.

We find appellants' contentions on appeal to be without merit and, therefore, their convictions are

AFFIRMED.

convicted of felonies or the election laws. *See S.C.Code Ann.* § 7–5–120(b) (Cum.Supp.1981).