UNITED STATES of America, Plaintiff,

v.

Antonio CABRERA–SARMIENTO, et al., As Consolidated, Defendants.

Nos. 80–413–Cr, 81–129–Cr, 81–210–Cr, 80–497–Cr, 81–238–Cr, 81–236–Cr, 81–62–Cr, 81–23–Cr, 78–189–Cr, 81–230–Cr, 81–296–Cr, 80–230–Cr, 81–270–Cr and 81–434–Cr.

United States District Court,
S. D. Florida.

Jan. 11, 1982.

MEMORANDUM OPINION ON
MOTION TO DISMISS

HATCHETT, Circuit Judge, Sitting by Designation.

INTRODUCTION

Fourteen criminal cases are consolidated for purposes of this motion to dismiss the defendants' indictments. Defendants allege that they were indicted in violation of their fifth and fourteenth amendment rights to equal protection under the law and their sixth amendment right to a jury selected from a fair cross-section of the community. Defendants have adduced evidence intended to show that Latins, blue collar workers, young adults and under-educated persons were underrepresented on grand juries, and that Latins, blacks, and women were underrepresented as to grand jury forepersons. Defendants allege this underrepresentation has long been the status quo in the Southern District of Florida, that it is the result of invidious discrimination, and that it has resulted in a jury not drawn from a fair cross-section of the community. Defendants further allege that the manner in which the court personnel selected the grand juries is not in substantial compliance with the Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861–1875. Finding neither constitutional infirmity nor substantial non-compliance with the Act, the motion to dismiss is denied.

CONSTITUTIONAL CLAIMS

Defendants maintain that the indictments against them should be dismissed because the district court judges in the Southern District of Florida have discriminated against certain cognizable groups in appointing grand jury forepersons. Such discrimination is in violation of fifth and fourteenth amendment equal protection. Defendants also assert that underrepresentation both as to the makeup of the grand juries and as to grand jury forepersons violates their sixth amendment right to a jury composed of a fair cross-section of the community. Defendants have presented testimony and evidence purporting to show underrepresentation by blacks, women, and Latins as grand jury forepersons, and underrepresentation by Latins, blue collar workers, young adults and the less-educated on the grand juries. These figures compare the persons serving as grand jurors and as forepersons with the general population figures.

I will first address the basic question of whether constitutional significance attaches to the position of federal grand jury forepersons. I am aware that this question has met with different responses from trial benches within the Eleventh Circuit. *See, e.g., United States v. Cross*, 516 F.Supp. 700 (M.D.Ga.1981); *United States v. Holman*,

510 F.Supp. 1175 (N.D.Fla.1981); *United States v. Jenison*, 485 F.Supp. 655 (S.D.Fla. 1979).

The Supreme Court was faced with a fourteenth amendment challenge to a conviction resulting from an indictment by a Tennessee grand jury in *Rose v. Mitchell*, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979). The defendants challenged the validity of their indictment on the ground that the state judge discriminated against blacks in appointing grand jury forepersons. This discrimination resulted in underrepresentation by blacks in that office. As I interpret that opinion, the Court first found that constitutional issues were involved. The Court then established the requirements of a prima facie showing of discrimination and the requirements of an effective rebuttal. Finally, the Court determined that the defendants had failed to establish a prima facie case. In finding that the fourteenth amendment guarantee applied to the selection process of the grand jury foreperson, the Court cited to "the strong policy the Court consistently has recognized of combating racial discrimination in the administration of justice." 443 U.S. at 558, 99 S.Ct. at 3001. The Court clearly stated that where criminal defendants are able to establish discrimination in violation of the fourteenth amendment, either the trial court will correct the error by quashing the indictment or the court of appeals will do so. 443 U.S. at 556, 99 S.Ct. at 3000.

The argument that *Mitchell* is distinguishable on the basis that the Court was addressing a Tennessee grand jury rather than a federal grand jury is unpersuasive. This argument asserts that the Tennessee foreperson is a more powerful figure than his or her federal counterpart and therefore is in a better position to influence the outcome of the deliberations. The argument goes that the potential for abuse of the position is therefore greater. Prejudice to the defendant, however, is irrelevant to a discussion of constitutional rights in this context. The Court stated that it has consistently rejected the argument that "the heavy social cost entailed in a reversal [is] unjustified, *especially in light of the fact that the defendant himself has suffered no prejudice.*" 443 U.S. at 554, 99 S.Ct. at 2999 (emphasis added). The Court indicated that it would quash an indictment where discrimination was proved "without regard to prejudice." 443 U.S. at 556, 99 S.Ct. at 3000. It is also significant that the *Mitchell* Court outlined the duties of the Tennessee foreperson in a footnote without discussing the relevance of those duties to the outcome of the decision. *See* 443 U.S. at 548 n.2, 99 S.Ct. at 2996 n.2.

It is thus clear that the relative power of the foreperson is irrelevant to a discussion of the constitutional significance of the office, since the only relevance would be the prejudice to the defendant. Further, it is clear that the federal foreperson does occupy an office of some importance and influence. Trial judges consistently testify that they attempt to appoint persons with "leadership ability," "management skills," "the ability of presiding," in short, "the best qualified person." *United States v. Holman*, 510 F.Supp. 1175, 1180 (N.D.Fla.1981); *United States v. Jenison*, 485 F.Supp. 655, 665–66 (S.D.Fla.1979).

■ My determination that *Mitchell* stands for the proposition that constitutional significance attaches to the office of federal grand jury foreperson was recently reenforced by the Fifth Circuit sitting en banc. In *Guice v. Fortenberry*, 661 F.2d 496 (5th Cir. 1981), that court was faced with "the contention that each petitioner's right to equal protection of the laws, guaranteed by the fourteenth amendment, was violated by the systematic exclusion of black persons from service as grand jury foremen." *Guice*, at 498.[1] In finding that

---

1. As an initial act of formation, the Eleventh Circuit sitting en banc determined to recognize as binding precedent the body of law in the former Fifth Circuit as it existed on September 30, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981). That court reserved for future consideration the precedential value of decisions submitted to the former Fifth Circuit before September 30, 1981, but released after that date. *Bonner* at 1209 n.5. *Guice v. For-*

constitutional significance attached to the office of foreperson in Louisiana, the court stated: "If convictions must be set aside because of taint of the grand jury, we see no reason to differentiate the result because discrimination affected only the foreman." *Guice*, at 499. Like *Mitchell*, the *Guice* court was addressing a state grand jury foreperson.

Neither the selection process of the Tennessee foreperson nor that of the Louisiana foreperson is identical to the selection process of the federal system. In Tennessee, the court selects the foreperson from the population at large, and the remaining members are selected at random from a venire drawn up by a jury commission. *Mitchell*, 443 U.S. at 548 n.2, 99 S.Ct. at 2996 n.2. In Louisiana, the court selects the foreperson from a venire of between twenty and one hundred persons, and the remaining members are selected at random from that same venire. *Guice*, at 504. In the federal system, the court selects the foreperson from the members of the grand jury after they have been selected at random from the venire. While the potential for abuse is less in Louisiana than in Tennessee, and less in the federal system than in either state, the Supreme Court has stated in *Mitchell* that in the context of the fourteenth amendment the concern is not with the possibility of prejudice to the defendant, but rather, with the possibility of discrimination within the legal process.

Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice. Selection of members of a grand jury because they are of one race and not another destroys the appearance of justice and thereby casts doubt on the integrity of the judicial process. The exclusion from grand jury service of Negroes, or any group otherwise qualified to serve, impairs the confidence of the public in the administration of justice. As this Court repeatedly has emphasized, such discrimination 'not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government.' *Smith v. Texas*, 311 U.S. 128, 130 [61 S.Ct. 164, 165, 85 L.Ed. 84] (1940) (footnotes omitted). The harm is not only to the accused, indicted as he is by a jury from which a segment of the community has been excluded. It is to society as a whole, 'The injury is not limited to the defendant—there is injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts.' *Ballard v. United States*, 329 U.S. 187, 195 [67 S.Ct. 261, 265, 91 L.Ed. 181] (1946).

*Mitchell*, 443 U.S. at 555–56, 99 S.Ct. at 3000. It would certainly be curious to hold that a criminal defendant's fundamental right to equal protection of the laws is more zealously guarded in the state courts than in the federal courts. I therefore find that under *Rose v. Mitchell*, constitutional significance attaches to the office of federal grand jury foreperson.

Defendants have attacked their indictments citing violation of their fifth and fourteenth amendment rights to equal protection under the law and their sixth amendment right to a jury selected from a fair cross-section of the community. I will address these allegations separately.

### A. Fifth Amendment

■ The Fifth Circuit, following Supreme Court precedent set in *Rose v. Mitchell*, has held "that racial discrimination in the selection of the grand jury and its foremen violates the [equal protection clause of the] fourteenth amendment and requires a federal court to grant habeas corpus, reversing a state criminal conviction." *Guice*, at 498. When addressing the federal system, the equal protection clause is applied through the due process clause of the fifth amendment. *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). *See*

---

*tenberry* is such a case. Because of the present twelve active judges on the Eleventh Circuit, nine joined the *Guice* opinion, with two joining

the dissent and one recused, we must treat that opinion as highly persuasive if not binding authority.

*also* *Schlesinger v. Ballard,* 419 U.S. 498, 500 n.3, 95 S.Ct. 572, 574 n.3, 42 L.Ed.2d 610; *Schneider v. Rusk,* 377 U.S. 163, 168, 84 S.Ct. 1187, 1190, 12 L.Ed.2d 218 (1964). A defendant has standing to challenge the exclusion of cognizable groups from the grand or petit jury under the fifth and fourteenth amendments even though that defendant is not a member of the excluded group. *Peters v. Kiff,* 407 U.S. 493, 497–500, 92 S.Ct. 2163, 2165–67, 33 L.Ed.2d 83 (1972) (plurality opinion).

In order to establish a prima facie case of discrimination,

> the petitioner must: (1) establish that the group against whom discrimination is asserted is a recognizable, distinct class, singled out for different treatment; (2) prove the degree of underrepresentation by comparing the proportion of the group in the total population to the proportion called to serve, hear as foremen, over a significant period of time; and (3) support the presumption thus created by showing that the selection procedure is susceptible to abuse or is not racially neutral.

*Guice,* at 499. *See also, Mitchell,* 443 U.S. at 563, 99 S.Ct. at 3004; *Castaneda v. Partida,* 430 U.S. 482 at 494, 97 S.Ct. 1272 at 1280, 51 L.Ed.2d 498.

■ I will first address defendants' allegations concerning discrimination against Latins. In order to show that Latins constitute a legally cognizable group within the meaning of the equal protection clause, defendant must "establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or applied." *Castaneda v. Partida,* 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977), *citing Hernandez v. Texas,* 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954). I am convinced that Latins in the Miami area meet that criteria. I find, however, that the figures presented by the defendants to show underrepresentation by Latins on grand juries and as forepersons are deficient. Defendants were unable to provide any officially recognized figures showing the Latin population broken down by age, citizenship, and English language ability. I will take judicial notice of the fact that many Latins living in the Miami area are newly arrived aliens, and therefore are ineligible for jury duty because of lack of citizenship, inability to speak English, or other conceivable reasons, Fed.R.Evid. 201. Because of this, figures showing the general Latin population in the area are meaningless. Defendants attempted to provide the needed figures by quoting from the "Dade Latin Survey Market." Testimony revealed, however, that this study was commissioned by several Miami area radio stations which transmit in Spanish with programming and advertising aimed at Miami's Latin population. Not only are these figures unofficial, but the objectivity of the survey is questionable. I therefore find that the defendants have failed to prove underrepresentation by Latins both as to the makeup of grand juries and service as forepersons.

■ Defendants next attempt to show that blue collar workers, adults under thirty years of age, and persons with less than a high school education constitute separate cognizable groups within the meaning of fifth and fourteenth amendment equal protection. I have read defendants' brief and have heard live testimony, and I am not convinced that any of these three categories constitute a legally cognizable class. Because I reach this finding, I need not address the figures presented by the defendants purporting to show their underrepresentation on grand juries and as forepersons.

■ Defendants' figures as to blacks and women are more acceptable. There is no doubt that both blacks and women represent distinct classes often singled out for separate treatment under the laws. *See Castaneda v. Partida,* 430 U.S. at 494, 97 S.Ct. at 1280; *Taylor v. Louisiana,* 419 U.S. 522, 531, 95 S.Ct. 692, 698, 42 L.Ed.2d 690 (1975). The statistics were essentially the same as those presented in *United States v. Jenison,* 485 F.Supp. 655 (S.D.Fla.1979), in which Jenison challenged the same judges and essentially the same grand juries.

Now, as then, I am satisfied that the figures show substantial underrepresentation by blacks and women in the ranks of those chosen to serve as grand jury forepersons. This court recognizes that "the selection of forepersons is susceptible of discrimination since the district judge can observe the race, ethnic background, and sex of the grand jurors beforehand." *United States v. Jenison*, 485 F.Supp. at 663. Defendants have thus satisfied all three requirements set forth in *Mitchell* in proving a prima facie case of discrimination in selection of grand jury forepersons as to women and blacks. Defendants did not present figures attempting to show underrepresentation of women and blacks on the grand juries as a whole.

When the defendants presented a prima facie case of discrimination, the burden of proof shifted to the government to prove lack of discriminatory intent. *Mitchell*, 443 U.S. at 565, 99 S.Ct. at 3005; *Guice*, at 499. One workable method of rebutting a prima facie showing that state or federal judges intentionally discriminated against a cognizable group in appointing grand jury forepersons is to question the judges as to the presence or absence of discriminatory intent in their selection process. Because discriminatory intent is completely subjective, this is possibly the only method of rebutting the prima facie case.[2] *See, e.g., United States v. Holman*, 510 F.Supp. 1175 (N.D.Fla.1981); *United States v. Jenison*, 485 F.Supp. 655 (S.D.Fla.1979). I have read the deposition of one judge, and I have heard live testimony from all other judges concerned. I am convinced from the testimony that no judge acted with discriminatory intent in selecting the foreperson of any grand jury. I therefore find that the government has carried its burden of rebutting the prima facie case of discriminatory intent.

I have followed *Rose v. Mitchell* and *Guice v. Fortenberry* in allowing the defendants to establish a prima facie case of discrimination in selection of grand jury foreperson by comparing the percentage of a cognizable group serving as forepersons with the percentage of that group in the population at large. Yet, I am convinced of the unfairness of this comparison. I feel that in determining whether a judge preferred one class of people over another, we must look at the pool from which he had to select. In *Mitchell*, this would be the population at large. 443 U.S. at 548 n.2, 99 S.Ct. at 2996 n.2. In *Guice*, this would be the grand jury venire. *Guice*, at 504. In the federal system, this would be the grand jury presented to the judge. Figures based on the population as a whole are relevant in determining whether a group was substantially underrepresented on the jury venire, which is selected from the community. These figures should not, however, be used in showing discriminatory intent on the part of the judge in selecting forepersons. Because the judge operates in the microcosm of the courtroom, the only "population figures" relevant to him in selecting a fore-

---

2. In this case, two of the judges called as witnesses by the government interposed objections to testifying under a subpoena as to their mental intent in selecting grand jury forepersons. These judges cited *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) and *United States v. Morgan*, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941), as authority for the proposition that judges may not be required to testify as to their mental processes absent a showing of bad faith. After putting their objections on the record, the judges testified voluntarily, fully, and in detail about their selection methods. Their concern is understandable, and their patience and forthrightness commended.

This situation presented a potential dilemma. On the one hand, the defendants had shown a prima facie case of discrimination, and the government bore the burden of rebutting that case by showing lack of discriminatory intent on the part of the judges who made the forepersons selections. On the other hand, such an inquiry touches upon the mental processes of the judge. By testifying voluntarily, the judges spared the court the choice of dismissing the indictments for failure of the government to rebut the prima facie case, or to rule on the judges' right to refuse to testify.

The extent to which the judges submitted themselves to cross-examination is best shown by the attempted cross-examination of Judge Hoeveler. After having thoroughly questioned Judge Hoeveler concerning his method of selecting forepersons, defense counsel persisted in what was a meaningless discussion of the definition of every day terms.

person relate to the "population" of the grand jury. If, for example, a cognizable group is totally excluded from the venire, a defendant would surely have a valid complaint as to the make-up of the venire, but he could hardly accuse the judge of discrimination because he failed to appoint a member of the excluded group as foreperson.

Moreover, I can find no legal authority for preventing each defendant indicted by a grand jury from bringing a new challenge notwithstanding the fact that the judge in question has already testified to the satisfaction of the fact finder that he did not harbor discriminatory intent in selecting forepersons. Because the elements of a prima facie case remain constant from one defendant to another, it is theoretically possible for a different defendant to appear each week, presenting the same statistics showing underrepresentation and questioning the same judges as to their mental intent in selecting forepersons. After having counsel in this case brief this issue, I am convinced that the body of criminal law contains no doctrine in the nature of nonmutual collateral estoppel which would bind all subsequent defendants to a prior finding of lack of discriminatory intent. Nor may a trial judge take judicial notice of a prior finding concerning the same facts. Fed.R. Evid. 201.

This is the end result of *Rose v. Mitchell.* We are witnessing a criminal proceeding in which the defendant lounges in the gallery watching his lawyer try the system. A parade of judges, clerks of court, and other court personnel take the witness stand to defend their every action and their character under cross-examination. We are, of course, bound to follow Supreme Court and Eleventh Circuit precedent, and until the signals from those two bodies change, we

can expect to witness more challenges such as this one.[3]

### B. Sixth Amendment

Defendants next assert that because certain cognizable classes have been underrepresented both on grand juries and as grand jury forepersons, their sixth amendment right to a fair cross-section has been violated.

■ The sixth amendment, which guarantees criminal defendants a trial by a fair and impartial jury, requires that the jury be drawn from a fair cross-section of the community. *Smith v. Texas,* 311 U.S. 128, 130, 61 S.Ct. 164, 165, 85 L.Ed. 84 (1940). A jury from which certain groups of people have been excluded does not represent a fair cross-section of the community, and any defendant appearing before such a jury has been denied a fundamental right secured by the Constitution. *Taylor v. Louisiana,* 419 U.S. 522, 526–28, 95 S.Ct. 692, 695–97, 42 L.Ed.2d 690 (1975). A criminal defendant has standing to challenge the exclusion of a class of individuals resulting in a violation of the requirement of a fair cross-section, even though he is not a member of the excluded class. *Taylor,* 419 U.S. at 526, 95 S.Ct. at 695–96. The requirement of a fair cross-section applies to grand juries as well as to petit juries. *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979).

The Court in *Duren* held:

In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the

---

**3.** This case points up a need to develop in criminal law a concept of estoppel to prevent constant relitigation of the same facts. As to challenges to grand and petit juries, we now allow a criminal defendant to litigate a civil action, complete with extensive discovery, expert testimony, and voluminous documentary evidence, through the vehicle of a pretrial motion. Additionally, every defendant awaiting trial may join this time-consuming process by simply filing the same motion. After one defendant has presented statistics showing a prima facie case, other defendants may "borrow" these statistics to prove their own prima facie case, forcing the government to rebut the same case over and over again. Every venire is subject to attack by every defendant without regard to the facts found in previous cases in the same district. This is a problem ripe for appellate attention.

number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process. *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979). The government can rebut this sixth amendment challenge only by showing "that a significant state interest [is] manifestly and primarily advanced by those aspects of the jury-selection process . . . that result in the disproportionate exclusion of a distinctive group." 439 U.S. at 367–68, 99 S.Ct. at 670–71. Because the first two prongs of the sixth amendment test laid out above are the same as the equal protection test, the earlier discussion concerning equal protection pertains to this section involving the sixth amendment challenge.

■ I have held today that Latins in the Miami area constitute a cognizable group within the meaning of the fifth, sixth, and fourteenth amendments. Defendants, however, have failed to establish the second prong of the *Duren* test because they have been unable to provide the court with figures sufficiently reliable to prove significant underrepresentation as to Latins.

Because I find that blue collar workers, young adults and under-educated persons do not constitute a legally cognizable group, defendants have failed to establish the first prong of the *Duren* test for these persons.

Defendants have presented no figures showing underrepresentation by blacks and women on the grand juries in question. Defendants did, however, establish a prima facie case of underrepresentation by blacks and women as grand jury forepersons. The question thus comes down to whether defendants' sixth amendment right to a grand jury drawn from a fair cross-section of the community was violated when they were indicted by a grand jury on which blacks and women were underrepresented as forepersons. If so, the question becomes whether the government has met its burden of rebutting the prima facie case with a showing of a compelling state interest.

In *United States v. Jenison*, the court held:

The purpose of the fair cross-section requirement is to assure both the 'diffused impartiality' of a jury drawn from a broadly representative pool and 'Community participation in the administration of the criminal law.' *Taylor v. Louisiana*, 419 U.S. at 530–31 [95 S.Ct. at 697–98]; quoting *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 227 [66 S.Ct. 984, 989, 90 L.Ed. 1181] (1946) (Frankfurter, J., dissenting). Neither of these purposes is offended when disproportionate representation is shown in the office of foreman on grand juries whose members were drawn from panels reflecting a fair cross-section of the community from which they were drawn. The fair cross-section right extends to defendants the opportunity of a jury whose members reflect the several 'qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable.' *Peters v. Kiff*, 407 U.S. 493, 503–4 [92 S.Ct. 2163, 2168–67, 33 L.Ed.2d 83] (1972). Absent a showing that the impact of the grand jury foreperson is so substantial as to influence or alter the unique qualities and characteristics of the jury's individual members, a defendant's right to a fair cross-section is not denied where identifiable groups are underrepresented in the position of grand jury foreperson.

485 F.Supp. at 661–62.

In *United States v. Holman*, 510 F.Supp. 1175 (N.D.Fla.1981), the court assumed without holding that the defendants could establish a prima facie case of a sixth amendment violation by making a showing of underrepresentation, and that the state could rebut this prima facie case by showing a significant state interest manifestly advanced by those aspects of the selection process that result in the exclusion. The government in that case carried its burden. 510 F.Supp. at 1180.

The question must now be squarely faced: Can a sixth amendment challenge to the selection of federal grand jury forepersons ever prevail? Defense counsel has expended considerable effort in attempting to persuade this court of the power and impor-

tant duties of the federal foreperson. Unlike the fifth amendment equal protection argument, which is aimed primarily at eliminating invidious discrimination from the legal system, the sixth amendment challenge is primarily concerned with the fairness of the system to the defendant. The sixth amendment guarantees the criminal defendant the right to a trial by a jury selected from a fair cross-section of the community. The focus of a sixth amendment challenge is on the issue of fair cross-section rather than discrimination. *Jenison*, 485 F.Supp. at 660. The defendant need not allege purposeful discrimination, and the government may not rebut a prima facie case by showing lack of discriminatory intent. The only relevant question is whether the defendant stood before a jury which was drawn from a fair cross-section of his community.

The relevance of this question to a grand or petit jury is obvious. When a group as a whole is excluded or significantly underrepresented on a jury, the defendant is denied the attitudes, experiences, outlook, and accumulated wisdom of that group. The relevance of the similar question to the office of foreperson, however, is not so clear. Assuming a fair cross-section on the jury as a whole, the defendant enjoys the richness of the community's general make-up, even where certain groups are underrepresented as forepersons. The benefit of the fair cross-section to the defendant is destroyed only if the "impact of the grand jury foreperson is so substantial as to influence or alter the unique qualities and characteristics of the jury's individual members." 485 F.Supp. at 661–62.

I have studied the defendants' brief and heard expert testimony regarding the role of the grand jury foreperson in the deliberations and functioning of the federal grand jury. I am convinced that the foreperson does not wield sufficient power to destroy the nature of an otherwise representative cross-section of the community. I therefore find that the *sixth amendment* has not been violated where a cognizable group has been excluded from service as

federal grand jury foreperson, *as long as the grand jury itself represents a fair cross-section of the community.*

## STATUTORY CLAIMS

Defendants next bring a battery of allegations of statutory infractions in selecting grand juries which, according to their theory, require dismissal of their indictments. Citing the Jury Selection and Service Act of 1968, 28 U.S.C. § 1867, and the Local Plan for the Southern District of Florida, defendants allege that the clerk of the court violated the Act by using improper methods to select starting numbers, and by failing to give adequate public notice of the drawing of starting numbers and the selection of jury names.

The defendants first argue that in order to foster the policy and protect the rights secured by sections 1861 and 1862 of the Jury Selection and Service Act, it is necessary to "prescribe some other source or sources of names in addition to voter lists" in accordance with 28 U.S.C. § 1863(b)(2). This is the same challenge as that brought in *United States v. Jenison*, 485 F.Supp. 655, 665 (S.D.Fla.1979), and the response is the same.

In drafting the Act, Congress realized the importance of using voting lists as a source of potential jurors when it stated:

The initial line of defense against [juror] incompetence is the requirement that voter lists be used as the primary source of potential jurors. Voter lists contain an important built-in screening element in that they eliminate those individuals who are either unqualified to vote or insufficiently interested in the world about them to do so.

H.R.Rep.No.1076, 90th Cong., 2nd Sess. (1968); *reprinted in* 1968 U.S.Code Cong. & Admin.News, 1792, 1795–96. Because the local plan for the Southern District of Florida concludes that "voter registration lists represent a fair cross-section of the community," the district court plan does not include any source other than voter registration lists from which prospective jurors are

chosen. The defendants' contention has been made and rejected in other cases challenging the use of voter registration lists in the Southern District of Florida. *United States v. Perry*, 480 F.2d 147 (5th Cir. 1973); *United States v. Gooding*, 473 F.2d 425 (5th Cir.), *cert. denied*, 412 U.S. 928, 93 S.Ct. 2752, 37 L.Ed.2d 155 (1973); *United States v. Blair*, 470 F.2d 331 (5th Cir.), *cert. denied*, 411 U.S. 908, 93 S.Ct. 1536, 36 L.Ed.2d 197 (1972); *United States v. Pentado*, 463 F.2d 355 (5th Cir.), *cert. denied*, 410 U.S. 909, 93 S.Ct. 963, 35 L.Ed.2d 271 (1972). Accordingly, the defendants' challenge to the use of voter registration lists as the sole source of names of prospective jurors is rejected.

▇▇▇ Defendants next attempt to show by expert testimony that the selection of jurors was not statistically random. Using a *post hoc* analysis, defendants assert that because the end result of the process is not statistically random, it then follows that the method of selection must have been improper. A similar allegation was addressed by the former Fifth Circuit in *United States v. Bearden*, 659 F.2d 590 (5th Cir., 1981).[4] Relying upon clear legislative history, the court stated that Congress did not intend for "random selection" under the Act to be defined as "statistical randomness." The *Bearden* court stated:

> The underlying concern, then, is that the methods used must not result or have the potential to result in discrimination among cognizable groups of prospective jurors. While the methods used here by the jury clerk were 'statistically non-random,' there is no showing they either allowed discriminatory selection of jurors or otherwise prevented jury panels from consisting of fair cross-sections of the community.

*United States v. Bearden*, at 602. Defendants have neither alleged nor proved that anyone in the clerk's office was able to manipulate the selection process so as to allow discriminatory selection of jurors or otherwise prevent jury panels from consist-

ing of fair cross-sections of the community. I therefore reject defendants' allegation that the jury selection process is improper because the end result does not conform to a statistician's technical definition of "randomness."

Defendants next allege that the drawings of starting numbers were performed in a nonpublic area of the courthouse, "and probably in the basement of the courthouse." Defendants, however, failed to prove this allegation with testimony. At most, testimony showed that the drawings took place on a counter separating an area open to the public from an area used only by employees of the clerk's office.

▇▇▇ The Jury Selection and Service Act provides for the dismissal of an indictment only when there has been a substantial failure to comply with the statutory provisions in selecting the grand jury. 28 U.S.C. § 1867(a). In determining whether there has been a substantial failure to comply with the Act, the court must weigh the alleged violations against the underlying principles of the Act. *United States v. Bearden*, at 600; *United States v. Maskeny*, 609 F.2d 183, 191 (5th Cir.), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980). One of the important general principles of the Act is "random selection of juror names from the voter lists of the district or division in which the court is held." *United States v. Bearden*, at 600, *quoting* H.R.Rep.No.1976, 90th Cong., 2d Sess. (1968); *reprinted in* 1968 U.S.Code Cong. & Admin.News, 1792, 1793. The court will find a substantial violation of the Act only when this principle is frustrated. Mere "technical" deviations from the Act or even a number of them are insufficient. *United States v. Bearden*, at 601; *United States v. Davis*, 546 F.2d 583, 589 (5th Cir.). I find that the defendants have failed to show a substantial failure to comply with the Act.

---

4. The Eleventh Circuit has not held that former Fifth Circuit opinions released after September 30, 1981, are binding precedent in the Eleventh Circuit. See note 1. Because Bearden arose in

Administrative Unit B, which was to become the Eleventh Circuit, I treat this opinion as highly persuasive if not binding authority.

Defendants also allege that the clerk's office used improper methods in selecting the "interval or quotient numbers." This allegation is spurious. Testimony showed that the interval or quotient number is not drawn or selected in the same manner as the starting number, but rather it is determined on the basis of the number of names required. For example, if 100 names were required, and there were 1000 numbers in the hopper, the interval number would be ten.

 Defendants proved with testimony and exhibits that the clerk's office failed to give adequate public notice of the drawings of starting numbers. Frequently, the notices were posted shortly before, during, or even shortly after the drawings occurred. There was testimony that the notices were posted in nonpublic areas of the courthouse, or in places not likely to be seen by the public. Finally, this court is convinced that the form used for public notice is inadequate. Nonetheless, the failure to provide adequate public notice of drawings does not necessarily constitute a substantial violation of the Act. *United States v. Bearden*, at 604. As stated previously, there has been neither allegation nor proof of wrongdoing on the part of the clerk of the court which affected the randomness of the selection of the jury. Defendants are seeking dismissal of their indictments because of mere technical deviations from the Act. I conclude that the failure to give adequate public notice in this case was not a substantial violation of the Act.

These findings should not be interpreted as judicial sanctioning of the cavalier attitude of the clerk of the court, and of the judges who supervise them, concerning the requirements of the Jury Selection and Service Act. The aim of the Act "is to assure all litigants that potential jurors will be selected at random from a representative cross-section of the community and that all qualified citizens will have the opportunity to be considered for jury service." H.R. Rep.No.1076, 90th Cong., 2nd Sess. (1968); *reprinted in* U.S.Code Cong. & Admin. News, 1792.

Although I have found that the practices of the clerk's office were in substantial compliance with the Act, the judiciary must take care to avoid any practice which "destroys the appearance of justice and thereby casts doubt on the integrity of the judicial process" or otherwise "impairs the confidence of the public in the administration of justice." *Mitchell*, 443 U.S. at 556–57, 99 S.Ct. at 3000–01.

### CONCLUSION

For the reasons stated above, I find that the defendants' constitutional rights were not violated because of the make-up of the grand juries which indicted them. Nor do I find substantial non-compliance with the Jury Selection and Service Act in the manner in which the clerk's office selected the grand jury. I therefore deny the defendants' motions to dismiss their indictments.