### UNITED STATES of America

v.

**Michael ABELL, Anthony Anello, Jr., Robert Byers, Jr., Stewart Campbell, Jr., Daniel Duval, Gervasio Guillen, a/k/a Jorge Ortiz-Gormasio, Sally Ivers, Fernando Lopez, James Michael Oliver, David Root, John Sachs, George Valdes, George Veillette, Jr., Fred F. Verderame, Walter Wendolkowski, a/k/a Tappey; a/k/a O.J., Raymond Zeman, Jr.**

**Crim. A. No. 82–00018–B.**

United States District Court,
D. Maine.

Nov. 23, 1982.

**318**

Jay P. McCloskey, Asst. U.S. Atty., Portland, Me., for plaintiff.

John R. Martin, Atlanta, Ga., for defendants.

## MEMORANDUM AND ORDER·

MAZZONE, District Judge.

This matter is before the Court on the defendants' motion to dismiss. All defendants were indicted on July 22, 1982 for conspiracy to knowingly and intentionally possess with intent to distribute a large quantity of marijuana, in violation of 21 U.S.C. § 846. One of the defendants, Veillette, was further charged in the same indictment with knowingly and intentionally possessing cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1).

The defendants have alleged irregularities in the selection process for grand and petit jurors and for grand jury forepersons, and seek dismissal of the indictments. They allege that members of the lower socioeconomic class have been systematically underrepresented on grand jury panels, and that women have been systematically excluded from service as grand jury foreperson. The defendants allege that the disproportionate underrepresentation of these groups on the grand jury venire and exclusion of women from the position of grand jury foreperson violates their rights as secured by the Fifth and Sixth Amendments to the Constitution and under the Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861 et seq. (the Act). The defendants have also moved to dismiss the indictment on the grounds that the grand jury venire is composed of jurors from only the Bangor division and not from the entire District of Maine.

Two hearings were held over three days to determine the factual basis for the defendants' claims. Together with numerous exhibits, the Court received expert testimony from social scientists on the identity and cognizability of the lower socioeconomic class in northern Maine and on the significance of the position of grand jury foreperson. Further testimony by a Senior Planner of the State Planning Office provided a statistical analysis for the State of Maine derived from 1970 and 1980 census data. Finally, the Court received the depositions of the two District Judges serving in Maine.

### Standing

■ The defendants have challenged the indictments returned against them on grounds that members of the lower socioeconomic class and women have been excluded from service as grand jury foreperson and on the grand jury venire. The defendants, all but one of whom are men, and none of whom may be members of the lower socioeconomic class, nevertheless claim that they have standing under the Fifth and Sixth Amendments and the Jury Selection and Service Act to establish inadequacies in the grand juror selection and service process.

■ To determine whether a complainant has standing, the Court must address two issues: whether it is alleged that "the challenged action has caused [the plaintiff] injury in fact, economic or otherwise;" and whether "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 152–53, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970).

■ The Sixth Amendment guarantees all criminal defendants the right to "speedy and public trial, by an impartial jury."

Similarly, the Jury Selection and Service Act of 1968 establishes the right to "juries selected at random from a fair cross-section of the community in the district or division wherein the Court convenes." 28 U.S.C. § 1861. These guarantees of indictment and trial by a jury drawn from a panel representative of a fair cross-section of the community do not lapse merely because the defendant is not a member of the allegedly excluded class. Regardless of the gender, race, and other characteristics of the particular defendant, a "fair cross-section" of the community must include members of all cognizable classes in the community. A grand jury drawn from a venire from which an identifiable group has been excluded does not represent such a fair cross-section, and *any* defendant indicted before such a grand jury has been denied a fundamental right secured by the Sixth Amendment and the Act. *Taylor v. Louisiana,* 419 U.S. 522, 526–28, 95 S.Ct. 692, 695–97, 42 L.Ed.2d 690 (1975); *United States v. Cabrera-Sarmiento,* 533 F.Supp. 799, 806 (S.D.Fla.1982). He is injured because his constitutional and statutory rights to an impartial jury have been violated and undoubtedly, he is within the zone of interests sought to be protected by these guarantees. Further, the injury resulting from defective selection procedures casts doubt upon the integrity of the judicial process. Therefore, I find that these defendants have standing to allege such violations of the Sixth Amendment and the Jury Selection and Service Act even though they may not be members of the excluded or underrepresented classes. *Taylor v. Louisiana, supra,* 419 U.S. at 526, 95 S.Ct. at 695; *United States v. Cabrera-Sarmiento, supra,* 533 F.Supp. at 806; *United States v. Musto,* 540 F.Supp. 346, 351 (D.N.J.1982).

The defendants have also challenged the jury selection process on equal protection grounds, through the due process clause of the Fifth Amendment. Seemingly inconsistent statements in several recent Supreme Court opinions raise some question over whether they have standing to make this claim. In *Peters v. Kiff,* 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1971), a plurality of the Court stated "when a grand or petit jury has been selected on an impermissible basis, the existence of a constitutional violation does not depend on the circumstances of the person making the claim." 407 U.S. at 498, 92 S.Ct. at 2166. The Supreme Court reaffirmed this statement in the context of a Sixth Amendment claim three years later in *Taylor v. Louisiana, supra,* 419 U.S. at 526, 95 S.Ct. at 695.

A different view was expressed by the Supreme Court in *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). Considering a claim that Mexican Americans were underrepresented in the grand jury selection process, the Court stated:

> [I]n order to show that an equal protection violation has occurred in the context of grand jury selection, the defendant must show that the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs.

430 U.S. at 494, 97 S.Ct. at 1280.

In *Rose v. Mitchell,* 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), the Supreme Court quoted with approval the above language from *Castaneda, supra,* 443 U.S. at 565, 99 S.Ct. at 3005, finding that defendants, black residents of Tennessee, have standing to challenge the exclusion of blacks from the position of foreperson of the state grand jury. At the same time, however, the Court emphasized the fundamental importance of the interests protected by the equal protection clause. The Court was unequivocal in its condemnation of a jury selection procedure that excluded a cognizable class of citizens otherwise able to serve, regardless of whether the party challenging the procedure was a member of the excluded group:

> The exclusion from grand jury service of any group otherwise qualified to serve, impairs the confidence of the public in the administration of justice. As this Court repeatedly has emphasized such discrimination not only violates our Constitution and the laws enacted under it but is at war with the basic concepts of a

democratic society and a representative government. The harm is not only to the accused, indicted as he is by a jury from which a segment of the community has been excluded. It is to society as a whole. The injury is not limited to the defendant—there is injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts. [citations omitted]

443 U.S. at 556, 99 S.Ct. at 3000.

This Court is aware that several lower courts have attempted a reconciliation of this seemingly conflicting authority. *See,* allowing standing, *United States v. Perez-Hernandez,* 672 F.2d 1380 (11th Cir.1982); *United States v. Cabrera-Sarmiento, supra; Guice v. Fortenberry,* 661 F.2d 496 (5th Cir.1981); *United States v. Jenison,* 485 F.Supp. 655 (S.D.Fla.1979); *but see,* denying standing, *Beal v. Rose,* 532 F.Supp. 306 (M.D.Tenn.1981); *United States v. Cross,* 516 F.Supp. 700 (M.D.Ga.1981); *United States v. Layton,* 519 F.Supp. 946 (N.D.Cal. 1981); *United States v. Musto, supra.* In considering the same question, this Circuit has held that a challenge on equal protection grounds to a jury selection system need not be brought by a member of the allegedly excluded group. *United States v. Butera,* 420 F.2d 564, 567 n. 2 (1st Cir.1970).

I am persuaded that the guarantees of the equal protection clause protect the integrity of and public confidence in the administration of justice, as well as individual rights. As a result, while conceding that the authority in this area is not unambiguous, I find these defendants have standing to assert their claims on equal protection grounds under the due process clause of the Fifth Amendment without regard to their membership in the allegedly excluded class.

*The Constitutional Significance of the Foreperson*

■ The defendants allege that the systematic exclusion of women from the position of grand jury foreperson violates their rights under the Fifth and Sixth Amendments and under the Jury Selection and Service Act of 1968. They urge this Court to find that their right to a grand jury venire free from the taint of discrimination and representative of a fair cross-section of the community extends to the position of grand jury foreperson. In order for the defendants to prove their claim, this Court must first determine whether constitutional significance attaches to this office.

Addressing the significance of the state grand jury foreperson, the Supreme Court indicated:

We may assume without deciding that discrimination with regard to the selection of only the foreman requires that a subsequent conviction be set aside, just as if the discrimination proved had tainted the selection of the entire venire.

*Rose v. Mitchell, supra,* 443 U.S. at 551 n. 4, 99 S.Ct. at 2998 n. 4.

Under Rule 6(c) of the Federal Rules of Criminal Procedure, the grand jury foreperson and deputy foreperson are appointed by the court. Rule 6(c) provides that the foreperson has the power to administer oaths, to sign indictments, to keep records with respect to the number of jurors concurring in each indictment, and to file these records with the court. Such duties, unlike the duties ascribed by some states to state grand jury forepersons, are purely ministerial. *United States v. Musto, supra,* 540 F.Supp. at 359; *United States v. Cross, supra,* 516 F.Supp. at 702–03; *see United States v. Cabrera-Sarmiento, supra,* 533 F.Supp. at 808.

The defendants' claim is brought under the Fifth and Sixth Amendments, alleging violation, respectively, of their right to equal protection of the laws and to representation of a fair cross-section of the community. There is substantial authority to the effect that the federal grand jury foreperson is constitutionally significant for purposes of equal protection analysis. *United States v. Cabrera-Sarmiento, supra,* 533 F.Supp. at 802; *United States v. Holman,* 680 F.2d 1340, 1357 (11th Cir.1982); *United States v. Perez-Hernandez, supra,* 672 F.2d at 1386; *United States v. Breland,* 522 F.Supp. 468, 477 (N.D.Ga.1981); *United*

*States v. Manbeck,* 514 F.Supp. 141, 148 (D.S.C.1981); *United States v. Jenison, supra,* 485 F.Supp. at 661.

Further, the Supreme Court in *Rose v. Mitchell, supra,* and the lower courts have consistently found that alleged discrimination in the selection of state grand jury forepersons raises issues of constitutional significance. *Guice v. Fortenberry, supra,* 661 F.2d at 499; *United States ex rel. Barksdale v. Blackburn,* 639 F.2d 1115, 1120 (5th Cir.1981); *Williams v. Mississippi,* 608 F.2d 1021, 1022 (5th Cir.1979). It would certainly seem anomalous for this Court to find that the fundamental right of a criminal defendant to equal protection of the laws was more susceptible to protection in the state than the federal courts.

I find, therefore, that under the Fifth Amendment, constitutional significance attaches to the position of grand jury foreperson.

A different issue is presented by the question of constitutional significance under the Sixth Amendment. The Sixth Amendment requires that jurors, including grand jurors, be selected from a fair cross-section of the community. *See Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). I am not aware of any decisions finding that the federal grand jury foreperson has significance under this amendment, nor have defendants directed us to any. Considering the same issue, one court has written:

> Absent a showing that the impact of the grand jury foreperson is *so substantial as to influence or alter the unique qualities and characters of the jury's individual members,* a defendant's right to a fair cross-section is not denied where identifiable groups are underrepresented in the position of grand jury foreperson. (emphasis added)

*United States v. Jenison, supra,* 485 F.Supp. at 661; *see United States v. Manbeck, supra,* 514 F.Supp. at 147. A similar statement is found in *United States v. Musto:*

> If defendants had demonstrated that the law has created a position which endows persons selected as forepersons with *such*

*overpowering influence that the views of other jurors are diminished substantially* during the deliberative process, then there would be concern that the values underlying the fair cross-section requirement were being threatened. (emphasis added)

540 F.Supp. at 362.

The Court received testimony from Dr. Charles Turner, a sociologist with expertise in social stratification and small group dynamics, as to the possibility of influence of the grand jury foreperson over other members of the panel. Dr. Turner testified that "the role of foreperson appears to be one like the chairman of most committees, and chairmen tend to be more powerful." He concluded:

> Given the available evidence ... in general, one would expect the foreperson to have some more influence than any other member of the jury; which is not to say that [in] each and every instance that will occur. But on the average, he is more likely to have more influence than anyone else. He is not just going to be one of twenty-three.

While acknowledging that the federal grand jury foreperson is not just "one of twenty-three," I find that it has not been shown that the position is endowed with such "overpowering influence" as to deprive the defendants of their right to a grand jury drawn from a fair cross-section of the community. Therefore, under the Sixth Amendment, the position is not of constitutional significance.

### The Defendants' Constitutional Claims

■ Having resolved the preliminary questions of standing to sue and significance of the position of grand jury foreperson, we turn to the core of the defendants' challenge: whether the selection procedures for the grand jury and for the foreperson were in fact violative of the defendants' constitutional rights. To establish their claims under both the Fifth and Sixth Amendments and the Jury Selection and Service Act, defendants have the burden of

first proving a *prima facie* case of discrimination. The elements of the *prima facie* case are undisputed:

> The first step is to establish that the group is one that is a recognizable, distinct class, singled out for distinct treatment under the laws, as written or as applied ... Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve ... over a significant period of time ... Finally, ... a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing.

*Rose v. Mitchell, supra,* 443 U.S. at 565, 99 S.Ct. at 3005, *quoting Castaneda v. Partida, supra,* 430 U.S. at 494, 97 S.Ct. at 1280. In short, defendants must show the presence of a distinct and legally cognizable class, the underrepresentation of the class over a period of time, and the susceptibility of the selection procedure to discriminatory application.

■ We first consider defendants' allegation that members of the lower socioeconomic class have been unconstitutionally underrepresented on grand jury venires in the District of Maine. The criteria and standards for determining that a class is legally cognizable for purposes of the Fifth and Sixth Amendments are the same:

(1) The presence of some quality or attribute which 'defines and limits' the group;

(2) A cohesiveness of 'attitudes or ideas or experience' which distinguishes the group from the general social milieu;

(3) A 'community of interest' which may not be represented by other segments of society.

*United States v. Test,* 550 F.2d 577, 591 (10th Cir.1976); *see Foster v. Sparks,* 506 F.2d 805, 819–21 (5th Cir.1975).

■ In order for a class to be legally cognizable, it must be characterized by "a common thread ... a basic similarity in attitudes or ideas or experiences which ... cannot be adequately represented if the group is excluded from the jury selection process." *United States v. Potter,* 552 F.2d 901, 904 (9th Cir.1977). There must be a definite and ascertainable membership:

> A cognizable group is not one whose membership shifts from day to day or whose membership can be arbitrarily selected.

*United States v. Guzman,* 337 F.Supp. 140, 143 (S.D.N.Y.1972), *affirmed* 468 F.2d 1245 (2d Cir.), *cert. denied,* 410 U.S. 937, 93 S.Ct. 1397, 35 L.Ed.2d 602 (1973).

In addition to internal cohesion, the group must be perceived as distinct by the community at large. Evidence of community discrimination tends to indicate that "a group [is] sufficiently distinct from the community to be a credible target for the exercise of community prejudices." *Ciudadanos Unidos de San Juan v. Hidalgo Cty.,* 622 F.2d 807, 818 n. 21 (5th Cir.1980).

In all but the clearest cases, such as classes based on race or gender, the presence of a cognizable class within the community must be established with respect to the particular community as a matter of fact:

> Throughout our history differences in race and color have defined easily identifiable groups which have at times required the aid of the courts in securing equal treatment under the laws. But community prejudices are not static, and from time to time other differences from the community norm may define other groups which need the same protection. *Whether such a group exists within a community is a question of fact.* (emphasis added)

*Hernandez v. Texas,* 347 U.S. 475, 478–79, 74 S.Ct. 667, 670, 98 L.Ed. 866 (1953).

To establish the presence of a cognizable lower socioeconomic class in Maine, the defendants presented testimony of two sociologists, Dr. James O'Reilly and Dr. Charles Turner.

Dr. O'Reilly testified that on the basis of information provided in juror qualification statements, certain classifications of potential jurors could be made. He indicated

that members of the lower socioeconomic class would be those who reported they had received less than a high school education and who, based on United States Census occupational classifications, were employed in blue collar jobs. It was his testimony that sociology has accepted the phenomenon of socioeconomic class, and that the lower socioeconomic class forms a cohesive group in our society. Dr. O'Reilly cited several possible indicators of this cohesiveness, including residential segregation and isolation, similar occupational and educational attainment, patterns of socialization, and intermarriage.

Dr. Turner similarly testified that patterns of social stratification established the "general dimensions and general architecture" of a lower socioeconomic class in American society. He noted segregation in residential patterns, social organization, and intermarriage as the most prominent indicators of class identity. As to the presence of attitudinal differences between distinct social classes, Dr. Turner cited a number of examples from national polls demonstrating significant differences in social attitudes among grade school, high school and college educated persons. It was also his testimony that nationwide, differences in social and political views were associated with different income levels.

In support of its position that no legally cognizable lower socioeconomic class was present in the District of Maine, the Government presented testimony of two expert witnesses, Richard Sherwood, Jr. and Dr. Peter Rossi.

Mr. Sherwood, a Senior Planner with the State Planning Office in Augusta, Maine with graduate training and college-level teaching experience in sociology and social stratification, testified as to certain of the occupational and educational characteristics of the population of northern Maine. Based on his personal observations and experience, he also testified as to the presence of a cohesive lower socioeconomic class in northern Maine.

Mr. Sherwood indicated that from 1970 to 1980 there had been a substantial increase in the percentage of the population in this region that had completed high school, from 53.2 to 70.2 percent. He noted that in 1970, this statistic represents educational attainment among those 25 years of age and older; while in 1980 it represents educational attainment among those 18 years of age and older. This difference, Mr. Sherwood stated, was the result of the use of different basing points by the United States Census in its analysis of the Census data.

Mr. Sherwood further testified that based on the United States Census occupational classifications, there had been some increase from 1970 to 1980 in the percentage of the population of northern Maine employed as white collar workers, from 39.9 to 46.2 percent. He noted, however, that the Census classification scheme had changed from 1970 to 1980, and that this revised administrative procedure might have caused a shift in the apparent size of the white collar workforce.

Finally, Mr. Sherwood testified that he had resided in Aroostook County in northern Maine from 1969 to 1974. During this time he was employed as a professor of sociology at Ricker College. Over the course of this five year period, Mr. Sherwood testified that he had opportunity to observe the social stratification in the communities in Aroostook County, which he described as characteristic of northern Maine. He stated that he had "serious reservations about whether the usual stratification system can be applied to northern Maine." He described a "historical pattern of a very stable population, people whose families have been there for generations." He further testified:

> [P]eople in the county have extended kin networks that run throughout the county and these kin lines cross the traditional white collar—blue collar dichotomy ... it's very difficult in Aroostook County to segregate yourself by socioeconomic class because you have got too many relatives on the other side of that boundary.

Mr. Sherwood observed that many of the settled areas were very small in population, and noted that this too would create diffi-

culties for residents attempting to restrict their associations to persons of their own socioeconomic status.

Dr. Rossi, a professor of sociology at the University of Massachusetts and a past director of the National Opinion Research Center, testified as an expert in sociology and demographic research. He indicated that the classification of persons into categories such as "white collar"¨and "blue collar" was a detailed task requiring:

> accurate information about the specific duties that the person is performing on their job and . . . a fairly specific idea of the kind of industry or business or farm that they are employed in.

The jury questionnaires relied upon by defendants in their analysis of jury employment status did not, he stated, provide "that kind of detail which would be necessary to do an accurate classification." He further testified that the categories excluded by the defendants in their analysis—housewives, retirees, students, and farmers—increased the inaccuracy of the defendants' analysis. Dr. Rossi concluded that it was more appropriate to rate households, and not individuals, with respect to socioeconomic status within a community.

I have considered all of the evidence presented by the defendants in their effort to prove the existence of a lower socioeconomic class in Maine. I have also considered the Government's testimony in opposition. I am persuaded by the defendants' testimony that there may be communities or circumstances in which groups sharing certain social or economic characteristics, such as a low level of educational attainment or blue collar employment, are identifiable, cohesive and legally cognizable groups for purposes of the Fifth and Sixth Amendments. *See Thiel v. Southern Pacific Co.,* 328 U.S. 217, 223–24, 66 S.Ct. 984, 987, 90 L.Ed. 1181 (1946); *United States v. Butera, supra,* 420 F.2d at 571. However, I am not persuaded that any such lower socioeconomic class has been identified within the District of Maine. The defendants presented no testimony directed to the presence in this District of a group whose "atti-

tudes or ideas or experience" are so particular as to render a grand jury from which they may have been excluded constitutionally infirm. Neither have defendants shown the existence in this District of community prejudice or bias. *Cf. Hernandez v. Texas, supra,* 347 U.S. at 479–80, 74 S.Ct. at 671. At most, this Court has been asked to infer the existence of a cognizable lower socioeconomic class from defendants' testimony as to attitudes and mores nationwide, and this we are unable to do. Whether a cognizable class exists within a community is a factual question to be answered in the context of the community. The defendants have the burden of establishing this as an element of their *prima facie* case under both the Fifth and Sixth Amendments, and this Court finds that they have failed to carry that burden.

While the Court has found that the defendants have not established the presence of a legally cognizable lower socioeconomic class in the District of Maine, it is appropriate to note a further potential infirmity in the defendants' *prima facie* case. In order to establish their Constitutional claims, defendants must not only establish the cognizability of the alleged lower socioeconomic class, and its underrepresentation on the grand jury venire, but they must also show that the grand jury selection procedure itself is susceptible to abuse. *Rose v. Mitchell, supra,* 443 U.S. at 565, 99 S.Ct. at 3005. In the selection of the grand jury foreperson, the possibility of abuse with respect to race, ethnic background, or gender may arise because the presiding judge has the opportunity to observe each of these characteristics prior to making a choice. *United States v. Cabrera-Sarmiento, supra,* 553 F.Supp. at 805; *United States v. Jenison, supra,* 485 F.Supp. at 663. Susceptibility to abuse has also been found when the selection procedure includes an automatic exemption of a cognizable class, such as women, from jury service. *Duren v. Missouri, supra.*

Without becoming enmeshed in the operational details of the grand juror selection procedures employed in the District of

Maine, it is sufficient to observe that it is not apparent to this Court, and defendants have not argued, how these procedures, involving random selection of potential grand jurors from voter registration lists, could result in systematic exclusion of the alleged lower socioeconomic class.

Next considered is the defendants' allegation that women have been unconstitutionally underrepresented in the position of grand jury foreperson in the District of Maine. As discussed above, the position of grand jury foreperson is of constitutional significance only under the Fifth Amendment.

It is beyond dispute, and the Government does not contest, that women are a legally cognizable class for purposes of the Fifth Amendment. *Taylor v. Louisiana, supra,* 419 U.S. at 531–33, 95 S.Ct. at 698–99; *Ballard v. United States,* 329 U.S. 187, 193–94, 67 S.Ct. 261, 264, 91 L.Ed. 181 (1946). Neither can there be any question that the foreperson selection procedure is susceptible to abuse, for the simple reason that the appointing judge is plainly aware of the gender of the grand jurors at the time he makes his appointment. Finally, statistics made available in the Affidavit of Dr. O'Reilly demonstrate that over the last twenty years, at least 85 percent and possibly 100 percent of the grand jury forepersons appointed in the District of Maine were men.[1] Therefore, the absolute disparity between the percentage of women forepersons and women in the District's jury-eligible population is at least 35 percent, and it may be as high as 50 percent. This is clearly sufficient to establish a *prima facie* case of discrimination against women in the selection of grand jury forepersons.

■ Upon defendant's showing of a *prima facie* case of discrimination, under the Fifth Amendment the burden shifts to the Government to prove the absence of discriminatory intent. *Duren v. Missouri, supra,* 439 U.S. at 368, 99 S.Ct. at 670; *United States v. Jenison, supra,* 485 F.Supp. at 662. Rebuttal evidence may include testimony from the judges responsible for foreperson selection as to the method and considerations they apply in the selection process. Of course, mere "affirmations of good faith" in making individual selections are insufficient to dispel a *prima facie* case of systematic discrimination. *Alexander v. Louisiana,* 405 U.S. 625, 632, 92 S.Ct. 1221, 1226, 31 L.Ed.2d 536 (1972).

■ To rebut the defendants' *prima facie* case of discrimination, the Government offered the deposition testimony of the two District Judges who served in the District of Maine during the relevant time, the Honorable Edward T. Gignoux and the Honorable Conrad K. Cyr.[2]

Judge Gignoux testified that he based his selection of grand jury forepersons on all the information available to him at the time of empanelment, including each grand juror's occupation and occupational experience, education, age, and the physical appearance and demeanor of such grand juror in the courtroom. He further testified that he did not consider either race or sex in his appointment. Judge Gignoux stated that he considered education and occupational experience to be relevant indicators of intelligence and ability to manage a group discussion, and that he considered age to be a

1. Thirteen grand jury forepersons were appointed in the District of Maine from 1962 to 1982. Of these, gender can be determined for eleven, and they are all men. If both of the unknown forepersons are women, then the group is 85 percent men; if one is a woman, 92 percent men; and, of course, if both the unknown forepersons are men, the group is 100 percent men.

2. Both Judge Gignoux and Judge Cyr testified voluntarily; however, it appears from the cases that they would have been entitled to decline to testify as to their mental processes, even if

subpoenaed by this Court. While a judge may be competent to testify as to a cause not on trial before him, "judges are under no obligation to divulge the reasons that motivated them in their official acts; the mental processes employed in formulating the decision may not be probed." *United States v. Cross,* 516 F.Supp. 700, 707 (M.D.Ga.1981); *see Jones v. Fire & Casualty Insurance Co.,* 266 F.Supp. 91, 92–93 (D.Conn.1967); *Standard Packaging Corp. v. Curwood, Inc.,* 365 F.Supp. 134, 135 (N.D.Ill. 1973); *Annot., Judge as Witness in Causes Not on Trial Before Him,* 86 A.L.R.3d 633 (1978).

relevant indicator of maturity. Other qualities that he cited as desirable in the grand jury foreperson were attentiveness during empanelment, the ability to preside during deliberations, and leadership. Judge Gignoux indicated that he could think of no reason why he would not appoint a woman to serve as foreperson, and that he would not hesitate to select a woman as foreperson if she were qualified. Finally, Judge Gignoux stated that he did not confer with the Clerk's Office, the United States Attorney's Office, or Judge Cyr in making his selection.

Judge Cyr testified that on the one occasion that he had empaneled a grand jury and appointed a grand jury foreperson, he had available information as to the juror's address, occupation, employer, and spouse's occupation. He testified that the primary element that he took into consideration in making his selection was each juror's educational attainment, which he inferred from the jurors' occupations. He stated that he also took into account occupational experience and age as relevant factors, as they would bear on the capacity to understand and to assume responsibility such as the office of foreperson involves. It was his further testimony that race and gender would not play any part in his selection of a foreperson, that he knew of no reason why a woman would not be qualified to serve as foreperson, and that he would not hesitate to appoint a woman foreperson in the future. He concluded:

> What I would tend to do would be to look for the best, the most qualified, and I would generally tend to consider the education, experience, and the like.

The criteria for the selection of grand jury foreperson used by Judge Gignoux and Judge Cyr are similar to those outlined in *United States v. Perez-Hernandez, supra,* 672 F.2d at 1387–88, as sufficient to dispel the inference of discrimination raised by defendants in their *prima facie* case. *See also United States v. Breland, supra,* 522 F.Supp. at 471–74, 479–80; *United States v. Manbeck, supra,* 514 F.Supp. at 150.

The defendants argue that the testimony of Judge Gignoux and Judge Cyr amounts to no more than mere "protestations of good faith," and note that the Supreme Court has long held that such statements are insufficient to carry the Government's rebuttal burden. *Alexander v. Louisiana, supra,* 405 U.S. at 632, 92 S.Ct. at 1226; *Castaneda v. Partida, supra,* 430 U.S. at 498 n. 19, 97 S.Ct. at 1282 n. 19. I disagree with defendants' characterization of this testimony.

I find that the testimony offered by the Government in rebuttal sets forth a number of neutral criteria utilized by the judges in making their selections of grand jury forepersons. These criteria include education, occupation, age, and attentiveness during empanelment. I find that these criteria are not only reasonably objective, but also clearly relevant to the tasks of the grand jury foreperson as set forth in Rule 6(c) of the Federal Rules of Criminal Procedure.

Furthermore, I find that the substantial evidence is that the stated criteria were in fact faithfully applied. In the testimony of Judge Gignoux and Judge Cyr, there are more than simple protestations of officials regarding the lack of intent to discriminate, as "the assertions by the judges ... are strongly corroborated by other evidence in the record." *United States v. Breland, supra,* 522 F.Supp. at 480, *United States ex rel. Barksdale v. Blackburn, supra,* 639 F.2d at 1128. The grand jurors appointed to serve as grand jury forepersons actually possessed the qualities which the judges stated they were seeking, such as responsible positions of employment, significant educational attainment, and mature age.

Defendants argue that both Judge Gignoux and Judge Cyr had a constitutional duty to seek more information to determine if any of the women members of the grand jury panel were in fact qualified to serve as foreperson. The simple answer to this argument is that no such duty exists:

> We reject defendants' contention that the judges were required to elicit additional information from, or about, randomly-drawn grand jurors to seek out for appointment blacks and women who might

be 'qualified' as forepersons but whose jury questionnaires did not affirmatively indicate such 'qualification.' *The Constitution did not require the appointing judges to accord preferential treatment to any group but imposed upon them no more than the obligation to use non-discriminatory neutral criteria in selecting persons deemed adequate to perform the role of foreperson.* (emphasis added) *United States v. Breland, supra,* 522 F.Supp. at 480.

Upon consideration of all the evidence, it is the conclusion of this Court that the Government has met its burden of establishing the absence of discriminatory intent on the part of the judges responsible for the selection of the grand jury forepersons in the District of Maine. The presumption of unconstitutional action has therefore been rebutted.

### Defendants' "Bangor Division" Claim

 Defendants have alleged that the indictment returned against them should be dismissed because the grand jury venire was comprised only of jurors from the "Bangor division." Defendants claim that this is a violation of their rights under the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 *et seq.* A similar claim was raised in *United States v. Foxworth,* 599 F.2d 1 (1st Cir.1979). In that case, this Circuit held that such an allegation does not state a violation under the standards articulated by the Supreme Court:

[The defendant] has not shown that the registered voters in the various cities and towns allegedly excluded from the Master Jury Wheel constitute a cognizable group. Indeed, it can hardly be asserted that the registered voters in a given city or town are sufficiently 'distinct' to constitute a cognizable group.

599 F.2d at 4. *See also United States v. Raineri,* 521 F.Supp. 30, 38 (W.D.Wis.1980).

The fact that grand jury panels in this District may have been routinely selected from only a portion of the state is not evidence of a violation of the Jury Selection and Service Act, but rather a reflection of both compliance with the Act's provisions and practical reality. Absent a showing of discrimination against a particular legally cognizable segment of society, the defendants have no statutory or constitutional right to a grand jury drawn from the entire state. Accordingly, there is no merit to defendants' charge that the indictments should be struck because they were returned by a grand jury composed only of members from the "Bangor division."

### Conclusion

On the basis of the foregoing, this Court finds that defendants have not proven any violation of a statutory or constitutional right. Therefore, their Motion to Dismiss should be and hereby is DENIED.

SO ORDERED.